CAREY CANADA INC., Plaintiff,

v.

CALIFORNIA UNION INSURANCE
COMPANY, et al., Defendants.

The CELOTEX
CORPORATION, Plaintiff,

v.

CALIFORNIA UNION INSURANCE
COMPANY, et al., Defendants.

Civ. A. Nos. 83–1105, 86–1142.

United States District Court,
District of Columbia.

June 1, 1989.

Jerold Oshinsky, Nicholas J. Zoogman, Stephan G. Wielgoz, Karen L. Bush, Anderson, Baker, Kill & Olick, Washington, D.C., for plaintiffs.

Roger E. Warin, Daniel C. Sauls, John A. Flyger, Steptoe & Johnson, Washington, D.C., for defendant Home Ins. Co.

James W. Greene, William E. Nowakowski, Bromley, Brown & Walsh, Washington, D.C., for defendants Columbia Cas. Co. and Northbrook Excess and Surplus Co.

Nancy J. Gleason, Marybeth Jacobsen, Dowd & Dowd, Ltd., Chicago, Ill., for defendant Northbrook Excess and Surplus Ins. Co.

James P. Schaller, Christine Nykiel, Jackson & Campbell, P.C., Washington, D.C., for defendant National Union Fire Ins. Co. of Pittsburgh, Pa.

JOHN H. PRATT, District Judge.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

*Background*

The above entitled cases were tried from February 8, 1989 through February 14, 1989. Eleven witnesses presented live testimony. In addition, certain deposition testimony was read into the record and a great volume of exhibits were offered by the parties, including a substantial amount of additional deposition testimony. The recorded transcript of the proceeding alone totals 1187 pages.

The trial of these two consolidated cases was bifurcated, the Court having ordered on September 15, 1987 that the scope of defendants' exclusions and the affirmative defenses of mistake and estoppel (the defense of misrepresentation was subsequently withdrawn before trial) be tried first. Bifurcation was predicated on two rulings of the Court which held that the defendants' asbestos-related exclusions are ambiguous and that defendants accordingly would be permitted to present extrinsic evidence "for the purpose of showing that the parties' objective intentions were to exclude from coverage all asbestos-related diseases and not only the disease medically known as asbestosis." *See Carey Canada Inc. v. California Union Ins. Co.,* 83–1105, Mem. Opinion at 2 n. 1 (D.D.C. May 7, 1985); *Carey Canada Inc. v. California*

*Union Ins. Co.*, 708 F.Supp. 1 (D.D.C. 1989). We also pointed out that "the burden on defendants would not be light." Mem. Opinion at 9–10.

The issues presented at trial and awaiting decision are: (1) whether the exclusions set forth in the policies apply to all asbestos-related disease claims or only claims involving the distinct, single disease medically known as asbestosis; (2) whether the exclusions of the Home and National Union insurance policies should be reformed to express the intent of the parties to exclude all asbestos-related disease claims; and (3) whether plaintiffs should be estopped from claiming that defendants' policies do not exclude all asbestos-related disease claims.

## FINDINGS OF FACT

### A. *The Parties*

1. Plaintiffs are mining and manufacturing companies that have been named as defendants in numerous lawsuits alleging injury due to exposure to asbestos, a product which they once mined and processed. Carey Canada is a wholly-owned subsidiary of Celotex, which in turn is the wholly-owned subsidiary of its Florida–based parent company, Jim Walter Corporation (Jim Walter).

2. The three remaining defendants, The Home Insurance Company ("Home"), National Union Fire Insurance Company of Pittsburgh, Pennsylvania ("National Union") (2 policies), and Columbia Casualty Company ("Columbia"), are excess liability insurers which sold policies to Jim Walter that provide coverage to plaintiffs.[1] Plaintiffs seek a declaration that the asbestos-related exclusion in each of defendants' policies excludes only the distinct disease known as asbestosis and not any form of

cancer. Each of these four policies has a maximum exposure of $5 million.

### B. *The Policies at Issue*

3. Four policies sold by defendants remain at issue. Home's policy, no. HEC9631289, covers the period from 10/1/77–10/1/78 and has been held by this Court to follow form to the exclusion in the underlying Northbrook policy which states:

> [T]his policy shall not apply to claims made against the insured arising out of Asbestosis or any similar condition caused by Asbestos.

Two National Union policies remain at issue. The first, no. 118977, covers the period from 10/1/77–10/1/78 and states:

> [I]t is understood and agreed that any bodily injury or property damage claim or claims arising out of *all asbestosis operations* is excluded from the policy. (Emphasis in original.)

The second, no. 1226411, covers the period from 10/1/79–10/1/80, and has been held by the Court to follow form to the exclusion in the underlying United States Fire Insurance Company ("U.S. Fire") policy,[2] which states:

> [T]his policy shall not apply to any liability imposed upon the insured arising out of ASBESTOSIS. (Emphasis in original.)[3]

One Columbia Casualty policy also is at issue. That policy, no. RDX 416–93–97, covers the period from 10/1/78–10/1/79 and states that it:

> [S]hall not apply to liability imposed upon the insured arising out of asbestosis.

This policy adopts the exact wording of the underlying U.S. Fire policy's exclusion.

---

1. Northbrook Excess & Surplus Insurance Company ("Northbrook") and plaintiffs recently have settled their dispute, and plaintiffs are preparing appropriate papers to dismiss Northbrook from the case. Four successive policies sold by Northbrook, beginning on October 1, 1977, with a maximum total exposure of $45 million originally were at issue. Subsequent references to testimony and evidence regarding Northbrook will concern the issues as they relate to the four policies remaining in this litigation.

2. U.S. Fire was originally a party to this action but was dismissed when plaintiffs and U.S. Fire determined to litigate their dispute out of court in an Alternate Dispute Proceeding. (ADP). The decision in that case will be treated hereinafter.

3. *See Carey Canada Inc. v. California Union Ins. Co.*, 83–1105, Mem. Opinion at 2 n. 1 (D.D.C. May 7, 1985).

C. *The Personnel Who Participated In The Negotiation Of The Policies At Issue*

4. The employees of Jim Walter most involved in obtaining excess liability insurance for Jim Walter were Charles Harvey and Vernon Herrmann. From 1972 to 1983, Harvey was the Director of the Jim Walter Corporate Insurance Department and from 1972 until 1984, Herrmann was the Assistant Manager. Both of these individuals presented testimony.

5. Rollins Burdick Hunter (RBH) served as Jim Walter's retail broker in securing this coverage. Jim Walter relied on RBH exclusively to represent its interests and was Jim Walter's agent throughout the entire period. RBH employees most involved were Ron Ursich, Larry Sorensen and Randy Tchon. These persons were beyond the reach of this Court's subpoena power and their depositions (with the exception of Ursich who is deceased) were taken by defendants.

6. The employees of Northbrook and of the remaining defendants who were most involved were:

(a) Northbrook —

Richard Foss who was Vice President of Northbrook until 1978 in charge of casualty underwriting.

Wayne Wentz, a Northbrook underwriter, was directly involved with the Jim Walter renewal in 1977. Wentz' immediate contact was Avreco, a wholesale broker, which dealt with RBH, the retail intermediary of Jim Walter. Robert Kampa was an underwriter with Avreco. Both Foss and Wentz appeared as witnesses.

(b) Home—

Walter Lucas, excess lines underwriter until April 1978, dealt primarily with Larry Sorensen of RBH in connection with the Jim Walter renewal in 1977. Lucas appeared as a witness.

(c) National Union—

Kandis Pinkstaff, underwriter until 1978, dealt primarily with Larry Sorensen of RBH in connection with the Jim Walter renewal in 1977.

Willie J. Lane joined National Union in 1978 as an underwriter and was in charge of the 1979 renewal. He dealt only with RBH. Both Pinkstaff and Lane appeared as witnesses.

(d) Columbia Casualty—

Ronald Cosentino, underwriter until 1979, was concerned with the 1978 renewal. He dealt directly with Terrence Winkler.

Winkler was President of Dependable Insurance Associates, a wholesale broker, which was the middleman between RBH, the retail broker, and Columbia Casualty. Cosentino and Winkler appeared as witnesses.

7. The role of RBH through its employees, Ursich, Sorensen and Tchon, as retail brokers for Jim Walter, in the negotiations and writing of the policies at issue is of critical importance. Not only was it in direct communication with Jim Walter but also in direct contact with Avreco on behalf of Northbrook, Lucas (Home), Pinkstaff and Lane (National Union), and Dependable on behalf of Columbia Casualty. The oral and written communications by and to RBH and the action of the parties in response thereto provide extrinsic evidence of their objective intentions.

D. *Plaintiffs' Position*

8. Plaintiffs' basic contention is that the term "asbestosis" refers to a single, discrete disease caused by exposure to asbestos and that it is widely recognized as a noncancerous fibrosis caused by the inhalation of asbestos fibers. It is to be distinguished from pleural plaques which are a noncancerous fibrotic condition of the lining of the abdominal cavity, mesothelioma and lung cancer. We find that asbestosis is a medical term and, when correctly used, makes reference to a specific, single disease caused by the inhalation of asbestos fibers. While there was some evidence from the medical experts, particularly from Dr. Jerrold Abraham appearing for defendants, that the term "asbestosis" is occasionally used generically, to cover related diseases caused by asbestos, the medical

meaning of the term is not in serious dispute.

9. Plaintiffs' contention is supported by medical definitions, by the compensation statutes of certain states and by legal decisions. Court decisions dating at least as far back as 1972 have defined and described "asbestosis" as a distinct disease and have differentiated asbestosis from mesothelioma and lung cancer. *See Utter v. Asten–Hill Mfg. Co.,* 453 Pa. 401, 309 A.2d 583 (1973), *affirming in relevant part, Bambrick v. Asten–Hill Mfg. Co.,* 5 Pa. Commw. 664, 291 A.2d 354 (1972); *Borel v. Fibreboard Paper Prods. Corp.,* 493 F.2d 1076, 1083–85 (5th Cir.1973), *cert. denied,* 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974). Further, in a well known May 1978 insurance coverage decision, *Insurance Co. of North America v. Forty–Eight Insulations, Inc.,* 451 F.Supp. 1230, 1236–37 (E.D.Mich.1978), *aff'd,* 633 F.2d 1212 (6th Cir.1980), *aff'd on rehearing,* 657 F.2d 814 (6th Cir.), *cert. denied,* 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981), the court carefully discussed the separate asbestos-related diseases of asbestosis, mesothelioma, and lung cancer, and noted that asbestosis was a nonmalignant condition, while mesothelioma and lung cancer were malignant conditions.

10. Additionally, between 1971 and 1973, Congressional committees considering toxic substances control legislation took detailed public testimony which addressed four separate conditions caused by asbestos that had been identified: (i) asbestosis; (ii) pleural plaques; (iii) mesothelioma; and (iv) lung cancer. *See Toxic Substances Control Act of 1971 and Amendment Hearings Before the Subcomm. on the Environment of the Senate Comm. on Commerce,* 92nd Cong., 1st Sess., Serial No. 92–50, at 123–31, 171–75. Thus, the meaning of asbestosis was a matter of public record years before defendants' policies were sold.

11. Numerous general circulation newspaper and magazine articles about the various asbestos-related health hazards, including articles in *The New York Times, The Wall Street Journal, The New Yorker Magazine,* and *The Washington Post,* also had been published by the time defendants sold their policies to Jim Walter. *See Canadian Johns–Manville, Ltd. v. Canadian Indemnity Co.,* No. 500–09–000780–858 (Canadian Ct. App., Province of Quebec, District of Montreal, Oct. 25, 1988), slip op. at 18–20.

12. Additionally, at least as early as January 1974, insurance industry trade journals which were widely read by and disseminated among insurance underwriters had published articles differentiating among the conditions of asbestosis, mesothelioma, and other cancers. These include the *Business Insurance* issues of January 21, 1974, September 30, 1974 and April 19, 1976, June 23, 1978, June 11, 1979 and the issue of *National Underwriter* of August 31, 1979.

13. These articles demonstrate that, during the relevant time period, "asbestosis" was being used accurately in insurance industry publications read by underwriters, to refer to a distinct disease. The articles also recognize that asbestosis and asbestos-related cancers have very different characteristics. Because these articles composed part of defendants' own industry literature, and were part of the context in which defendants sold their policies, the Court finds that defendants may have been generally aware of the information contained in them. The record shows that defendants' underwriters in fact routinely received and some read insurance industry trade publications such as *Business Insurance* and *National Underwriter,* as part of their professional duties and responsibilities. They claim that while these articles may have been available, they do not remember reviewing specific articles in the insurance trade publications which discussed the asbestos-related health hazards. Some of defendants' witnesses testified that they generally recalled reading such articles during the late 1970s.

14. To conclude this discussion of plaintiffs' position, we find again that the term "asbestosis" refers to a separate disease caused by asbestos and is distinct from plaques, mesothelioma and bronchogenic

carcinoma. Plaintiffs have supported this position by reference to medical authorities, dictionary definitions, congressional testimony and articles from insurance industry publications. This does not conclude our inquiry as to the objective intentions of the parties when they executed their contracts.

### E. *The Position of Defendants*

15. It is defendants' basic contention that the term "asbestosis", however precise and limited in its medical definition, was very frequently used generically by all parties concerned with the writing of these excess liability contracts to refer to all diseases caused by asbestos. In support of this contention, they point to the oral and written communications between the parties, Jim Walter's treatment of loss data, its treatment of the Aetna exclusion and its failure to give notice of disease claims under the policies at issue until April 12, 1983, three days before filing one of the present actions.

16. Jim Walter Corporation had no connection with any of the defendant carriers. It relied exclusively on RBH which was its sole retail broker and exclusive agent.

17. At least by the summer of 1977, the manufacturers of asbestos and asbestos products were deluged with thousands of suits for bodily injury and property damage arising out of the use of asbestos. When Aetna issued its primary policies effective on and after October 1, 1977, Jim Walter, through its employees, Charles Harvey and Vernon Herrmann, was aware of the asbestos exclusions in the Aetna policies. Defendants never saw those Aetna exclusions before the commencement of this litigation.

18. With respect to the 1977 renewal, Harvey had numerous conversations with RBH and during the summer of 1977 was advised by RBH that many companies were not interested in quoting coverage because of the asbestos problem. On September 30, 1977, October 4, 1977, and on October 13, 1977 Harvey advised Jim Walter's top management that RBH had been "completely unsuccessful in finding any responsible insurance carrier to cover *asbestos claims.*" (emphasis supplied.) Previously on October 10, 1977, RBH had recommended that the coverage be renewed *"without the asbestosis coverage"* (emphasis supplied), and Harvey authorized on October 12, 1977 RBH to renew the umbrella coverage *"excluding asbestosis."* (emphasis supplied.) Throughout the fall of 1977, Harvey of Jim Walter and Ursich used the terms "asbestosis" and "asbestos claims" interchangeably as did Herrmann of Jim Walter. Harvey never advised his management that he had ever been successful in finding an insurance carrier who would narrow the exclusion.

19. As shown by Jim Walter's provision of loss data to carriers, Jim Walter continued after 1977 to use the term "asbestosis" to mean all asbestos-related disease claims. Herrmann supplied RBH with loss data, showing prior claims experience, in order for RBH to submit such information to prospective excess carriers. These loss data were complied from computer summaries of loss runs obtained from Aetna. Applications for insurance sent to the carriers (and Jim Walter) by RBH for each of the years from 1978 through 1982 included claims paid by plaintiffs for alleged cancer but identified as product losses excluding "asbestosis losses." This is further evidence that Jim Walter and RBH interpreted the Aetna exclusion and defendants' exclusions to both exclude all asbestos and related disease claims.

20. On October 31, 1977, Herrmann of Jim Walter asked RBH to seek a premium reduction from Northbrook because of the fact that its asbestos exposure had been removed. Later Aetna coordinated the asbestos exclusion in its Primary Products Policy with endorsement no. 16 of the Northbrook policy, which excluded "asbestosis or any similar condition caused by asbestos." After this change, which was to delete the phrase "or property damage," Aetna continued to exclude all asbestos-related disease claims. On September 12, 1979, Herrmann advised Jim Walter personnel that Aetna's "[p]roducts liability policies do not include coverage for asbestosis." Jim Walter and RBH continued to

refer to Aetna's policies as having an asbestosis exclusion. It is clear that Jim Walter and plaintiffs, at least as far as Northbrook was concerned, regarded the asbestosis exclusion to have the same scope as the Aetna policy which excluded all asbestos-related disease claims.

21. Between October 1, 1977 and April 12, 1983, a period of 5½ years, a total of 22,490 asbestos-related claims were filed against plaintiffs. It was part of Herrmann's responsibility to send copies of such complaints to RBH for transmission to the excess carriers. In so doing, Herrmann did not separate claims alleging asbestosis from claims alleging other diseases. At the same time, Herrmann sent a copy of a form letter to Aetna, containing a postscript addressed to RBH containing instructions regarding which policies RBH was to notify of claims. RBH then sent copies of the complaint to the excess carriers with a transmittal letter identifying the carriers and the policies to which claims had been sent. From October 1977 until early January 1980, Herrmann specifically instructed RBH to send all asbestos-related disease complaints, including those for cancer and mesothelioma to Jim Walter's first layer pre–October 1977 excess policies. On December 5, 1979, Aetna sent a letter to Robert W. Emerton III of the Jim Walter legal department regarding the trigger of coverage for asbestos bodily injury claims and requested Jim Walter to notify all carriers, past and present of this position. Emerton, on December 19, 1979, so instructed Herrmann who on December 21, 1979 directed RBH to send Aetna's letter to "all insurers." Herrmann's December 21, 1979 letter and Aetna's December 5, 1979 letter only concerned pre–October 1977 policies. On October 18, 1980, Emerton sent a list of pending asbestos cases to eleven insurance carriers. All of these had issued pre–October 1977 policies to Jim Walter. None were sent to any of the present defendants. On April 24, 1980, Herrmann in sending this list to RBH captioned his letter "Asbestosis lawsuits" and referred to it as the "listing of asbestosis cases" even though many of the claims alleged only mesothelioma and cancer. From January

1980 until April 1983, pursuant to notice from Jim Walter, RBH sent notice of numerous claims, alleging mesothelioma and cancer, only to excess carriers with pre-October 1979 policies with no "asbestosis exclusions." On April 6, 1983, just a few days before the present suits were filed, Emerton for the first time instructed Herrmann "to begin" giving notice of asbestos-related disease claims to carriers who had written excess coverage, unless it was "absolutely clear from the complaint that the claim was for asbestosis alone." For the first time, Herrmann was advised to put post-October 1977 carriers on notice of possible liability.

22. We find that plaintiffs' treatment of loss data (¶ 19), their interpretation of the Aetna exclusion (¶ 20) and their notice practices (¶ 21) are relevant evidence that plaintiffs understood defendants' policies to exclude all asbestos-related disease claims.

23. The 1980 and 1981 Annual Reports to Stockholders (published on October 16, 1980 and October 29, 1981 respectively) state that Celotex had brought:

> a declaratory judgment against all of its comprehensive liability insurance carriers for policy years prior to October 1, 1977 (coverage for asbestos-related diseases has been excluded from policies since that date).

This statement was prepared by Emerton of Jim Walter's legal department. The suit referred to is *Celotex Corporation v. Aetna Casualty & Surety Co*, No. 79–5885, Circuit Court for Hillsborough County, Florida (Hillsborough Action).

24. In these 1980 and 1981 Annual Reports and in response to certain interrogatories in the Hillsborough Action, Jim Walter and plaintiffs admitted that the policies at issue do not cover any asbestos-related disease claims.

24. RBH, as Jim Walter's retail broker agent, was authorized to obtain the excess policies at issue. Jim Walter had no direct communications with the excess carriers but acted through Larry Sorensen and Randy Tchon of RBH. Ron Ursich of RBH, who died before he could be deposed, was

not involved with the present policies. Larry Sorensen and Randy Tchon placed the coverages at issue. Sorensen and Tchon were in immediate contact with the excess carriers Northbrook, Home, National Union and Columbia Casualty. As marketers, they acted through either Avreco, a wholesale broker for Northbrook, Lucas, an underwriter for Home, Pinkstaff and Lane, underwriters for National Union, or Dependable, a wholesale broker for Columbia Casualty. The record is replete with instances showing that Sorensen and Tchon not only used the term "asbestosis" in its generic sense but used and understood the term to mean all asbestos-related disease claims. Accordingly, we find that RBH, when it negotiated the policies at issue on behalf of Jim Walter, beginning in 1977 and for many years thereafter understood and used the term "asbestosis" to mean also asbestos-related disease claims.

25. The two wholesale brokers, Avreco and Dependable, had a similar understanding of the term "asbestosis." In connection with the placement of the Northbrook and Columbia Casualty policies, Avreco's vice president, Robert Kampa, from Northbrook, and Dependable's then vice-president, Terrence Winkler, for Columbia Casualty, dealt directly with the carriers' underwriters, Wayne Wentz for Northbrook and Ron Cosentino for Columbia Casualty, respectively. Through the deposition testimony of Kampa, which refers to his connections with Wentz of Northbrook and Sorensen of RBH, it is apparent that RBH and Kampa in the fall of 1977 were having difficulty in getting excess coverage which did not exclude asbestos disease claims and that when coverage was finally agreed upon, it was the intent of all concerned that all losses from asbestos were excluded. It was Kampa's belief that Sorensen and RBH used the terms "asbestosis losses" and "asbestos-related" claims interchangeably.

Similarly, when Columbia Casualty was negotiating its 1978–79 policy through Dependable, Winkler of Dependable, as an intermediary, dealt with Sorensen of RBH and Cosentino of Columbia Casualty. The deposition testimony of Kampa and the live testimony of Winkler are consistent with and corroborate the deposition testimony of Sorensen, Tchon and the contemporaneous conduct of Jim Walter. This testimony is not disputed.

26. As for the insurers, Northbrook, Home, National Union, and Columbia Casualty, the underwriters for each of said carriers gave testimony confirming their understanding that the term "asbestosis" was intended to involve all asbestos-related disease claims. Wentz, as early as September 21, 1977, sent Kampa of Avreco a telex containing a renewal quotation for the 1977 policy which offered a renewal "excluding asbestosis." He acted at the direction of Richard Foss, Northbrook's vice-president. The wording of the Northbrook exclusion that it shall not apply to claims "arising out of Asbestosis or any similar condition caused by Asbestos" was intended by Wentz to have the same meaning as the September 21 telex "excluding Asbestosis." Charles White of Northbrook who underwrote the 1978 policy had the same understanding.

The same is true of Walter Lucas, underwriter for Home, whose 1977 policy incorporated the wording of the Northbrook policy. *Carey Canada, Inc. v. California Union Ins. Co.*, No. 83–1105, Mem. Opinion at 2 n. 1 (D.D.C. May 7, 1985). In the fall of 1977, Lucas discussed with Sorensen of RBH the exclusion of coverage for asbestos-related claims in the Northbrook policy to which Home would follow form and twice wrote letters to Sorensen confirming Northbrook's policy to exclude all asbestosis exposures. He was not familiar in the fall of 1977 with the separate diseases, mesothelioma, plaques, or bronchogenic carcinoma, but understood "all asbestos exposures" to mean all claims arising out of the inhalation of asbestos fibers.

Kandis Pinkstaff and Willie J. Lane, underwriters for National Union, negotiated the 1977 and 1979 policies. With respect to the 1977 policy, Pinkstaff in conversations and written communications with Sorensen, testified that she proposed an exclusion "for asbestosis operations" which Sorensen accepted on October 28, 1977. She testified

by excluding "asbestosis operations" she intended to exclude Jim Walter's asbestos exposure. The policy thus written reflects National Union's initial reaction to decline renewal because of the asbestos exposure. It also reflects the fact that Pinkstaff at that time was unaware that asbestosis was a single medical disease. With respect to the 1979 policy negotiated by Willie J. Lane, Lane testified that he spoke to Sorensen about coverage and told Sorensen that Jim Walter's operations that involved asbestos would have to be excluded. Sorensen replied that was not a problem, having previously indicated in his solicitation letter of August 3, 1979 that there was difficulty in providing coverage for asbestos products and that "[a]ccordingly, asbestosis[,] as it relates to the products liability hazard, should be excluded from the [u]mbrella." At the same time, Lane confirmed this understanding in an interoffice memorandum, advising that "anything related to [a]sbestos" would be excluded from any policy issued to Jim Walter.

Ron Cosentino, an underwriter for Columbia Casualty, negotiated the 1978 policy, with Terrence Winkler of Dependable, the wholesale broker, used by Columbia Casualty, a small company, to screen applications for coverage. Winkler's contacts were with RBH. Cosentino received an application from RBH on behalf of Jim Walter which was forwarded to him by Winkler. Columbia Casualty then issued the policy with an asbestos-related exclusion in endorsement 4. In January 1979, Winkler in a telex to Cosentino conveyed RBH's request that Columbia Casualty change its asbestos exclusion to follow form to the exclusion contained in the U.S. Fire policy, endorsement 15, which excluded any liability "imposed upon the insured arising out of asbestosis." Cosentino agreed to the request and made the change. Cosentino at the time was not familiar with the medical aspects of asbestos-related diseases. He testified that he knew breathing asbestos could cause bodily injury and that this was what he intended to exclude. In agreeing to this change, he thought the "asbestosis" exclusion in the U.S. Fire policy carried out this intent.

We are aware that the several underwriters of the insureds, Foss, Wentz, Lucas, Pinkstaff, Lane and Cosentino were directly employed by defendants and that Avreco and Dependable, while independent wholesale brokers, had a close relationship with two of the insureds. All were called to give live testimony on behalf of the defendants, and the testimony of Kampa of Avreco was taken by deposition. Implicit in their testimony is the inference of possible bias stemming from these associations. On the other hand, the same cannot be said of the employees of RBH, Ursich, Sorensen, and Tchon, two of whom could not be subpoenaed but had to be deposed. Comparing these two groups, the Court was impressed with the consistency of the versions of the events at issue. Accordingly, we give full credence to the testimony of these persons who were underwriters for the insuring carriers.

27. In summary, we find that defendants have produced clear and convincing evidence that, in the context of the situation existing in 1977 when asbestos manufacturers were inundated with thousands of lawsuits, the parties used the term "asbestosis" to exclude such risks in the generic sense. We further find in using the term "asbestosis" that it was objectively intended by all the parties that the exclusion of "asbestosis" should be interpreted to mean the exclusion of "all asbestos-related disease claims."

## CONCLUSIONS OF LAW

1. This Court has personal and subject matter jurisdiction over these actions.

2. As a Federal Court sitting in diversity, the Court is required to apply the choice of law principles of the forum. The issues in these actions are governed by either Illinois or Florida law, both of which states having a substantial interest in this dispute. The law of these two jurisdictions presents no conflict in the governing legal principles and the Court therefore need not choose between the laws of these two jurisdictions.

3. Under the laws of both Florida and Illinois, the primary objective of a Court faced with the interpretation of an insurance policy is to determine the intent of the parties. An insurance company seeking to invoke an exclusion from coverage has a heavy burden.

4. Both Florida and Illinois law permit extrinsic evidence to be introduced where a court has determined that a term in an insurance policy is ambiguous. This Court has previously found that the "asbestosis" exclusions at issue in this litigation are ambiguous. *Carey Canada Inc. v. California Union Ins. Co.*, 708 F.Supp. 1, 4–7 (D.D.C.1989).

5. In reviewing the extrinsic evidence to determine the intent of the parties, we have placed great importance on the objective manifestation of the parties' intent and understanding, as shown by their acts, conduct, and communications, not on their subjective, unexpressed intent.

6. Plaintiffs also rely heavily on an unpublished decision rendered in connection with an Alternative Dispute Resolution ("ADR") proceeding between U.S. Fire International Insurance ("USFI") and plaintiffs. U.S. Fire and International were dismissed from this case when they signed the so-called Wellington Agreement, under which they agreed to resolve the interpretation of their "asbestosis" exclusions in the ADR proceeding. The ADR judge found that the 1978 and 1979 USFI policies excluded only the single disease asbestosis. The ADR decision is neither controlling on nor persuasive to this Court for several reasons. First, it is the result of a private contractual arrangement between plaintiffs, U.S. Fire and International. None of the defendants here were parties to the ADR proceeding, and no evidence was taken from these defendants in that case. The ADR judge in a proceeding handled with great dispatch also did not have the benefit of the voluminous documentary evidence presented in the present litigation. Second, the ADR judge ruled that U.S. Fire by signing the Wellington Agreement waived its right to contend that its policies excluded anything other than "asbestosis." In addition, the ADR judge concluded that the term "asbestosis" as used in U.S. Fire's exclusions was unambiguous and specifically that under the Wellington Agreement extrinsic evidence was not admissible to determine the intent of the parties. This is directly contrary to the findings in our May 7, 1985 and January 13, 1989 decisions, which we again reaffirm.

7. Based on the testimony given at trial and the Court's comprehensive review of the deposition testimony and documentary evidence submitted by the parties, we hold that the defendants have shown by clear and convincing evidence that all parties to these insurance contracts understood and interpreted them to exclude all asbestos-related disease claims, not just the single disease asbestosis. Therefore, we will enforce these contracts according to the parties' intent, and hold that each of the policies at issue excludes all asbestos-related disease claims. The same conclusion was reached by the only other court that has tried the issue of the meaning of an "asbestosis" exclusion. *See California Coordinated Proceedings*, Judicial Proceeding No. 1072 (Tentative Decision in Phase II) (Super.Ct.Cal. 3/17/87).

8. In view of the foregoing disposition, it is not necessary for the Court, in the alternative, to reach the affirmative defense of mistake asserted by defendants Home and National Union or the affirmative defense of mistake alleged by all defendants.

An order consistent with the foregoing has been entered this day.

### ORDER

Consistent with the foregoing Findings of Fact and Conclusions of Law, it is this 1st day of June, 1989

ORDERED that judgment be entered for the defendants in the above entitled actions; and it is

FURTHER ORDERED that these actions shall stand dismissed.