264 N.J. Super. 460 (1993)
625 A.2d 1
OWENS-ILLINOIS, INC., PLAINTIFF-RESPONDENT AND CROSS-APPELLANT,
v.
UNITED INSURANCE CO., OWENS INSURANCE LIMITED, AMERICAN RISK MANAGEMENT, INC., INTERNATIONAL RISK MANAGEMENT LTD., ARMRISK, INC., GENERAL REINSURANCE CORPORATION, ALLSTATE INS. CO. AND CIGNA REINSURANCE CO., DEFENDANTS-APPELLANTS AND CROSS-RESPONDENTS, AND AMERICAN REINSURANCE COMPANY, INTERVENOR.
Superior Court of New Jersey, Appellate Division.
Argued March 30, 1993.
Decided April 29, 1993.
*466 Before Judges MICHELS, BAIME and WALLACE.
Bertram E. Busch argued the cause for appellant and cross-respondent Owens Insurance Ltd. (Busch and Busch, attorneys; Mr. Busch, of counsel and on the brief).
Thomas F. Quinn argued the cause for appellants and cross-respondents American Risk Management, Inc., International Risk Management, Ltd. and ARMRISK, Inc. (Wilson, Elser, Moskowitz, Edelman & Dicker, attorneys; James Crawford Orr, of counsel; Mr. Quinn and Matthew S. Slowinski, on the brief).
David R. Gross argued the cause for appellant and cross-respondent General Reinsurance Corporation (Budd Larner Gross Rosenbaum Greenberg & Sade, attorneys; Cuyler, Burk & Matthews, of counsel; Mr. Gross, Joseph J. Schiavone and Donald P. Jacobs, on the brief).
Thomas A. Allen argued the cause for appellant and cross-respondent CIGNA Reinsurance Company (White and Williams, attorneys; Miller, Singer, Raives & Brandes, of counsel; Mr. Allen, Regina B. Mapes, Lawrence I. Brandes, Clifford H. Schoenberg and Nancy K. Eisner, on the brief).
*467 William J. Brennan, III argued the cause for intervenor American Reinsurance Company (Smith, Stratton, Wise, Heher & Brennan and Pope & John, Ltd., attorneys; Mr. Brennan, Wendy L. Mager, Robert J. Bates, Jr., Patrick J. Foley and Caesar A. Tabet, on the brief).
Andrew T. Berry argued the cause for respondent and cross-appellant Owens-Illinois, Inc. (McCarter & English, attorneys; Clifford & Warnke, of counsel; Mr. Berry, Gita F. Rothschild, Jerry P. Sattin, Anthony Bartell, Teresa L. Moore, Stephen Marinko, Sherilyn Pastor, Rosanne C. Kemmet and Arnold L. Natali, Jr., on the brief).
No one appeared on behalf of Amicus Curiae Insurance Environmental Litigation Association (Hughes & Hendrix, attorneys; Wiley, Rein & Fielding, of counsel; Gerald A. Hughes, Thomas W. Brunner, James M. Johnstone and Stephen P. Keim, on the brief).
David D'Aloia argued the cause for appellant and cross-respondent Allstate Insurance Company (Saiber Schlesinger Satz & Goldstein, attorneys; Mr. D'Aloia, Sean R. Kelly and Gregg S. Sodini, on the brief).
Allen E. Molnar argued the cause for appellant and cross-respondent United Insurance Company (Cuyler, Burk & Matthews, attorneys; appellant relied on the brief of Allstate Insurance Company).
The opinion of the court was delivered by BAIME, J.A.D.
These appeals and cross-appeals present difficult questions concerning the construction and application of a series of primary and excess insurance policies issued by United Insurance Company (United) and Owens Insurance, Ltd. (OIL) to their insured Owens-Illinois, Inc. (O-I). OIL passed off 100% of its umbrella liability to various reinsurers who have also appealed from the Chancery Division's judgment.
*468 Between 1948 and 1958, O-I manufactured Kaylo, a thermal insulation product containing asbestos. At present, claims against O-I for bodily injury and property damage caused by its asbestos products approach one billion dollars. O-I instituted suit in the Chancery Division, seeking a declaration of its right to indemnification and defense costs under its policies. The Chancery Division granted O-I's motion for summary judgment. In an oral opinion, the Chancery Division determined that O-I's claims were covered under various insuring agreements, and that the insurers and reinsurers had waived any defense based upon fraud or concealment.
We agree with the Chancery Division's interpretation of the insurance policies in question. We are also in accord with the court's adoption of the continuous trigger theory which provides that the date of occurrence of an injury process which is not a definite, discrete event encompasses the period from exposure to manifestation of injury or damage. We further hold that the liability of the insurers and reinsurers should be joint and several and that allocation of damages on a prorated basis is not feasible in light of the indivisible nature of the injury and damage sustained. However, we are obliged to reverse other parts of the Chancery Division's judgment and remand for a plenary trial. Specifically, we find genuine issues of material fact regarding (1) whether O-I's losses were "expected or intended," (2) whether the insurers and reinsurers waived their fraud defenses, and (3) whether the policies were issued by reason of a misrepresentation or concealment of material facts pertaining to potential asbestos liability.

I.

A. THE PARTIES
We begin by introducing the principal parties. O-I is a large Fortune 500 company which produces and sells various products, including shipping containers, bottles, cups, tubs, lids and stretch film fabricated from materials such as glass, paper, plastic and *469 wood. As of 1989, it was the largest manufacturer in the United States of building materials, with annual sales of 3.6 billion dollars.
American Risk Management (American Risk), International Risk Management, Ltd. (IRML) and Armrisk, Inc. (Armrisk) are three separate but affiliated companies of the Fred Reiss Group, an international organization which provides insurance and reinsurance brokerage, consulting and management services to companies desiring to create captive insurers. A captive insurer is a corporation organized for the purpose of insuring the liability of its owner. See Clougherty Packing Co. v. Commissioner, 811 F.2d 1297, 1298 n. 1 (9th Cir.1987). Although there may be other permutations, generally the insured is both the sole shareholder and the only customer of the captive insurer. Ibid. American Risk is the parent of the Fred Reiss Group's captive management companies in the United States. IRML is the Bermuda office. Armrisk conducts its insurance brokerage business in New Jersey. For convenience, we denominate American Risk, IRML and Armrisk as the ARMS defendants. Other companies in the Fred Reiss Group include European Risk Management (ERML), which provides brokerage services in Europe, and ARM International, the brokerage affiliate for American Risk.
OIL is a captive insurance company which O-I created in 1975. ARMS was instrumental in organizing OIL. Under an umbrella insurance policy, OIL covered O-I for certain liabilities in excess of the insured's deductible and its primary policy issued by United. In reality, OIL is a mere skeleton which, as we mentioned previously, passed off 100% of its liability to reinsurers. IRML solicited reinsurance for OIL's umbrella liability policies and performed claim management services. O-I owns 99.99% of OIL's stock, and several of its corporate officers were also employees of OIL. Richard Johnson, O-I's Director of Risk Management between 1977 and 1985, was also variously a director, vice president and president of OIL during that same period.
United was formed as part of the Fred Reiss Group to write both direct casualty insurance and casualty reinsurance for ARMS *470 clients. All United employees are also employees of the Fred Reiss Group. United is owned by a group of captive insurance companies, one of which is OIL. United was the primary insurer of O-I and one of the reinsurers of OIL between 1977 and 1985.
General Reinsurance Corporation (General) is the largest reinsurance company in the United States and was the lead reinsurer of OIL between 1977 and 1982. Allstate Insurance Company (Allstate) is a major insurance underwriter and reinsured a portion of OIL's liability. CIGNA Reinsurance Company, the successor to INA Reinsurance Company, reinsured OIL between 1977 and 1985, and reinsured a portion of O-I's umbrella policy issued by Aetna Casualty and Surety Company (Aetna). American Reinsurance Company (American) is a subsidiary of Aetna and reinsured a portion of OIL's liability from 1977 to 1985.

B. THE DANGERS OF ASBESTOS
In 1943, O-I's predecessor, the Owens-Illinois Glass Company, developed a new industrial product known as Kaylo, which could be used as a thermal insulating material. Before Kaylo was used commercially, O-I conducted an investigation through the Saranac Laboratory and the Trudeau Foundation to determine whether dust liberated from the product during the fabrication process would be likely to pose a respiratory hazard to exposed individuals. Tests were performed between 1943 and 1952. Several of the reports from those tests indicated that Kaylo could cause asbestosis and pulmonary disease in animals and should be handled industrially as a hazardous dust. For example, on March 12, 1943, Leroy U. Gardner, a director of the laboratory, wrote that the use of Kaylo, and more particularly the mixture of quartz and asbestos, "suggested that [the company had] all the ingredients for a first class hazard." More alarming was a letter sent by Arthur J. Vorwald, another director, on November 16, 1948. In the letter, Vorwald rejected prior tentative reports which indicated that Kaylo failed to produce significant pulmonary damage when inhaled. Instead, Vorwald reported that a "definite indication of tissue reaction appeared in the lungs of animals inhaling *471 Kaylo dust." Moreover, prolonged exposure to the product, more than 30 months, resulted in "unmistakable evidence" of asbestosis. On May 31, 1944, Gardner wrote that further studies disclosed "a pulmonary disease simulating asbestosis" was produced by exposure to "appreciable quantities of Kaylo dust." In its report dated October 30, 1948, the Saranac Laboratory found that "Kaylo, because of its content of an appreciable amount of fibrous chrysotile, [was] capable of producing asbestosis and should be handled as a hazardous industrial dust." Other reports were released on April 30, 1949 and January 12, 1950. Vorwald wrote, "[t]he results to date, although not conclusive, indicate that Kaylo stimulates a tuberculous process in the lung." In its final report issued on January 30, 1952, the Saranac Laboratory concluded that Kaylo dust, when inhaled for a prolonged period, was capable of "producing in the lungs of guinea pigs the peribronchiolar fibrosis typical of asbestosis."
O-I's response to these reports was limited to reducing its workers' exposure to Kaylo dust in the manufacturing process. The company continued to produce Kaylo until 1958. At that time, its Kaylo Division was sold to Owens-Corning Fiberglas (Owens-Corning). Thereafter, O-I neither manufactured nor sold asbestos-containing products. We note, however, that O-I was a major shareholder of Owens-Corning and received copies of that company's SEC filings which showed an increase in the number of asbestos actions instituted against it. In 1969, Owens-Corning was a named defendant in what became a landmark decision in the area of asbestos litigation. See Borel v. Fibreboard Paper Prods. Corp., 493 F.2d 1076 (5th Cir.1973), cert. denied, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974). By the mid-1970's, OIL's chairman knew about the asbestos cases filed against Owens-Corning but did not relay this information to the board of directors.

C. O-I'S PRODUCT LIABILITY INSURANCE
Between 1963 and September 1977, O-I obtained product liability insurance from Aetna under excess or umbrella policies. As we *472 will note later in our opinion, Aetna also supplied O-I's primary insurance policy which contained an exclusion for most types of product liability. As to its excess and umbrella coverage, the Aetna policies contained a $250,000 "self-insured retention" (SIR), essentially a deductible for each "occurrence" resulting in personal injury or property damage. Prior to September 1977, Allstate and CIGNA reinsured Aetna on the upper layers of its umbrella coverage.
In 1975, ARMS advised O-I of certain tax and insurance management benefits of establishing a captive insurer. It was at that time that ARMS helped O-I create OIL, a wholly owned subsidiary, to perform O-I's insurance services. IRML was then retained by OIL to obtain reinsurance. By 1976, ARMS had sold O-I property insurance and was soliciting its casualty lines to be underwritten by OIL.
Prior to September 1977, O-I's own legal staff processed asbestos claims which, at that time, were considered "inconsequential." Specifically, O-I relied on its legal department to investigate and defend claims arising out of its asbestos and glass products, although outside counsel were retained to supervise the product liability litigation. O-I and Aetna had agreed that O-I's duty to report claims would be triggered when an internal notice was sent to its risk management department, headed at that time by Johnson. O-I had a very successful loss history and thus maintained high deductibles on its policies. It maintained no "reserve" on product claims, but instead considered judgments and settlements as losses in the years paid.
O-I renewed its Aetna casualty coverage through September 1, 1977. However, prior to that date, Johnson engaged in a series of meetings with Robert Lonsdale, the president of American Risk and an officer of ARM International. Although other subjects were discussed, O-I sought to decrease its casualty insurance premiums and, therefore, considered changing its insurance provider and self-insuring more of its risk. Johnson told Lonsdale that O-I wished to duplicate its coverage with Aetna. To reduce *473 premiums, however, it was proposed that the umbrella coverage attach at one million dollars and that a primary policy be obtained to cover the $750,000 exposure between its $250,000 SIR and the one million dollar umbrella.
In June 1977, O-I prepared a "bid package" consisting of various materials describing the company's manufacturing activities and insurance risks, and the coverage it sought. O-I stated that its goals included self-insuring more of its risks, maintaining greater control over claims, utilizing OIL and reducing its costs. O-I expressly requested a primary comprehensive general liability (CGL) policy that specifically referred to product liability coverage:
Coverage desired is primary insurance over a $250,000 per occurrence retention with optional $500,000 and $1,000,000 retentions. This will be a combined CGL and CAL policy covering general (including products) and commercial vehicle exposures on a fronting arrangement for vehicle liability only with control of claims retained by O-I.
In addition, O-I sought a standard excess umbrella policy "endorsed to provide coverage at least as broad as underlying policies," with a fifty million dollar limit. It required that bids submitted "precisely follow[] the specs," and asked that specimen policies be provided as well.
Along with its bid package, O-I made certain disclosures in line with the types of information it had historically provided to Aetna when applying for insurance with that company. O-I also enclosed its product liability loss history, describing the five largest claims it had settled during the five prior years, and the five most serious open claims, none of which involved asbestos. It disclosed that in the past five years no claim had approached the $250,000 SIR level, and that it did not place "reserves" on open product liability cases. It also noted its past practice of giving Aetna notice of only those pending product liability claims which it felt "may approach the [$250,000] retention level." While the bid submissions related only to the products referenced in the 1976 Annual Report, potential bidders were free to contact O-I with particular questions.
*474 O-I's bid package contained no information respecting asbestos liability. Nor did it disclose that O-I had once manufactured Kaylo. The package invited bids for casualty insurance matching O-I's coverage requirements, commencing on September 1, 1977. Johnson reviewed and approved O-I's bid package, and thereafter participated in negotiations with various brokers and insurance providers.
ARMS submitted its proposal in response to O-I's solicitation. In the summer of 1977, ARMS requested additional information from O-I, specifically inquiring about "high risk" hazards such as potential claims for "silicosis caused by ingestion of airborne particles" or "other occupational diseases." Obviously, memories dimmed by the passage of time and the depositions of those involved in these discussions were not particularly illuminating. Lonsdale did not recall asking Johnson specifically about asbestos. However, he described an interview he had with William Rogers, O-I's industrial hygienist, in which the latter mentioned in passing that the law required "a complete medical survey if there [was] asbestos exposure."
We note that prior to September 1977, no insurance provider had ever requested a survey from O-I of its past or present products. Nor had any specific inquiries been made concerning current or potential asbestos claims. The record discloses that, as of July 28, 1977, O-I had made no payments in satisfaction of any of the twenty-three pending asbestos claims that had been filed against it.

D. O-I'S NEW CASUALTY INSURANCE PLAN
ARMS, on behalf of United and OIL, ultimately offered to provide insurance in accordance with O-I's bid specifications. Under its proposal, ARMS described a plan to "duplicate [O-I's] existing coverage with Aetna." Specifically, there was a one million dollar "primary products liability aggregate," including a $250,000 SIR. In addition, an umbrella policy would cover losses in excess of the primary coverage up to a limit of fifty million *475 dollars. The ARMS proposal thus consisted of two planks. United was to control the first. It would issue the general and product liability policy with a limit of one million dollars, and a $250,000 SIR. Hence, United's exposure was $750,000. OIL was in charge of the second plank, and would issue an umbrella policy essentially identical to its Aetna counterpart. The fundamental difference between Aetna's umbrella coverage and that offered by OIL was that Aetna's coverage "dropped down" and attached to product liability claims in excess of O-I's $250,000 SIR. In contrast, OIL's umbrella was a supplement to the one million dollar coverage to be provided by United. The OIL umbrella would provide coverage to O-I on an "ultimate net loss basis" up to fifty million dollars. However, the OIL policy was 100% reinsured.
O-I accepted ARMS' proposal on August 19, 1977. The new plan was to become effective on September 1, 1977. ARMS requested a copy of O-I's policy with Aetna because its scheme was designed to duplicate that coverage. O-I agreed to waive the requirement that ARMS present specimen policies. Factual disputes exist concerning exactly how the new policies were drafted. Apparently, O-I revised the Aetna policy and sent it to ARMS for typing. ARMS' Miller and Lonsdale were responsible for preparing the completed product. Although the record is somewhat vague on the point, it appears that O-I, OIL and United relied upon ARMS to draft the final policies consistent with the agreed upon proposal. We gather from the depositions that ARMS added some of the provisions which ultimately appeared in the executed policies. So too, these agreements did not include all of the revisions that O-I had made on the Aetna policies that had been sent to ARMS. Despite voluminous depositions, it is unclear how some of the additions and deletions originated and at whose instance.
We briefly digress to describe another somewhat confusing incident, although this pertains to one of the reinsurers, CIGNA. CIGNA had provided part of the umbrella coverage on the Aetna policies through 1976. Apparently unaware of O-I's negotiations with ARMS, Aetna's reinsurance broker contacted CIGNA in July *476 1977 and asked whether it wished to renew its reinsurance agreement. The broker telexed CIGNA that it would "[c]ontinue[] [the] expressed condition that there are no pharmaceutical products or asbeston [sic] products." CIGNA accepted the broker's renewal application, expressly stipulating that "there were ... no asbestos products." At about the same time, CIGNA learned that O-I authorized ARMS to place its 1977-78 insurance. According to CIGNA, ARMS stated that it "could rely on the information which [Aetna's brokers] had submitted in connection with the 1977-1978 aborted renewal" of the reinsuring agreement.

E. EXECUTED UNITED AND OIL POLICIES
Because of the delay involved in typing and executing the insuring agreements, United did not issue its 1977-1978 primary policy until December 12, 1978. OIL did not issue its 1977-1978 umbrella policy until December 13, 1978. We are told that such a delay between drafting and execution of a policy is not unusual in the industry.
The executed policies are formidable documents. The United policy contains 16 endorsements, 13 conditions with subparts, and numerous exclusions. In the cover jacket, cover page and declaration sheets, repeated references are made to "product liability." Indeed, the policy is entitled "General Liability  Products Liability." The broad language of the insuring agreement clearly encompasses bodily injury and property damage risks emanating from product liability. The "products hazard" is defined as including "[b]odily [i]njury and [p]roperty damage arising out of the [n]amed [i]nsured's [p]roducts...." However, buried in the list of exclusions is Exclusion J which states that coverage does not apply "[t]o personal injury or property damage arising out of the products hazard unless such injury or damage arises out of the sale or distribution of electricity, gas, food or beverages by the named insured." We have underscored the phrase "electricity, gas, food or beverages" because it is undisputed that O-I produces none of these products. Despite the sophistication of the parties, *477 this brief reference in the lengthy document apparently escaped the attention of the insured, its insurers, reinsurers and brokers. We will have occasion to again refer to this exclusion later in our opinion. The United policy otherwise comports with the ARMS proposal. There appears a $250,000 SIR and liability is limited to one million dollars.
OIL's umbrella policy is equally complex. The limits of liability are stated in terms of "$50,000,000 each occurrence" and "$50,000,000 aggregate product." Endorsement 2 provides, "[i]t is agreed that if any policy of [u]nderlying [l]iability [i]nsurance applies to an occurrence excluded ... in section 2.2 of this policy, the insurance afforded by this policy shall apply to such occurrence notwithstanding such exclusion." Section 2.2 contains numerous lettered exclusions. Under Endorsement 2, OIL's umbrella would cover risks encompassed in the underlying primary policy even if the umbrella did not specifically provide for such coverage or excluded it. We will return to this clause later in our opinion. Suffice it to say here, the "as broad as" clause is important because OIL later sought to add an exclusion to section 2.2 relating to asbestos risks.
Between September 1, 1977 and September 1, 1978, United reinsured OIL for the first "layer" of five million dollars. General reinsured OIL for the next five million dollars. American, Allstate and CIGNA, along with various other companies, reinsured OIL for additional layers of reinsurance up to the fifty million dollar umbrella limit.

F. O-I'S DEVELOPING KNOWLEDGE OF ASBESTOS CLAIMS
When the new ARMS insurance plan went into effect, approximately twenty-five asbestos claims were pending against O-I. In November 1977, Johnson orally apprised Aetna of the existence of these claims. No similar disclosure was made to United or OIL. In April 1978, Armrisk received a telex from its London-based affiliate, ERML, in response to Armrisk's efforts to increase OIL's *478 umbrella policy from fifty million to seventy million dollars. The telex stated that the "[u]nderwriter wish[ed] to know if there [was] any asbestos involvement in any process past or present." After receiving no response, ERML explained that coverage could be placed "only if satisfied on answers regarding asbestos use." That same day, Armrisk replied by telex, "no asbestos exposure." The source of this response is unclear. Although Armrisk's practice was to direct inquiries to the insured, the record is silent respecting whether that procedure was followed in responding to ERML's request.
In his depositions, Johnson testified that he met with Armrisk's representatives on May 15, 1978 and the subject of asbestos was discussed. Specifically, Johnson told them that he had reported the pending cases to Aetna. Johnson also testified that he subsequently received from Armrisk a judicial decision dealing with an insurer's duty to defend an asbestos manufacturer. Johnson remembered that it was also during May 1978 that he apprised General of the same asbestos cases that he had reported to Aetna. Although O-I continued to look to Aetna for coverage, Johnson claimed that he also kept ARMS apprised of the situation. O-I refrained from adopting an "official position" concerning whether liability was triggered by the claimant's exposure to asbestos or by the manifestation of the injury or damage. Despite O-I's repeated demands, Aetna denied coverage.
On May 26, 1978, Johnson wrote Aetna listing the various pending asbestos cases and damage claims against O-I. As of that date, there were over 150 such actions with an aggregate exposure of approximately $400 million. Aetna requested that O-I inform it of the asbestos claims on a "manifestation basis." O-I complied with that request.
In the meantime, ARM International solicited CIGNA to renew its portion of the OIL umbrella. The renewal solicitation made no mention of pending asbestos cases. In its request, ARM International represented that the risk subject to the renewal had "not *479 changed during the year." On September 1, 1978, O-I increased its umbrella coverage to $100 million.
By the summer of 1979, Johnson was of the view that O-I's asbestos exposure was "peaking." This opinion was predicated upon Johnson's understanding that most asbestos claims were filed within twenty years of the claimants' exposure. It will be recalled that O-I had not manufactured asbestos products since 1958. In an unsettling development, however, it was about this time that the Saranac Laboratory reports of the 1940s and 1950s were read on the floor of Congress. O-I's legal department concluded that claims emanating from exposure to Kaylo might be more numerous and more significant than originally anticipated.
On August 9, 1979, Johnson met with representatives of ARM, United, OIL and General in order to obtain the 1979 renewal of O-I primary and excess policies. Johnson's handwritten notes from that meeting indicated that he "mentioned asbestosis." Peter Nance, the representative of General who attended, remembered the meeting and acknowledged that the subject of O-I's past production of Kaylo and O-I's pending claims with Aetna "could have been discussed." However, he did not recall any specific conversations pertaining to those subjects. Nance's handwritten notes contain the words "asbestosis  sold 1958  Owens Corning." ARMS' Art Brown, also at the meeting, had no recollection of the subjects discussed independent of his notes, which contain the words "fiberglass insulation sold in the 50's [sic]," and "asbestos insulation."
In connection with the request to renew its portion of OIL's umbrella coverage in 1979, CIGNA received information concerning O-I's losses since 1975. The record does not disclose the source of this information. The "Loss Data" sheet provided:
1. No loss has exceed[ed] the $250,000 retention of [O-I].
2. In the past five years one loss has approached O-I's $250,000 retention (SIR). The claim [is] estimated at $250,000 payment plus legal expenses. Most claims often include other [defendants], such as the bottler and/or distributor. A majority of such claims involve cuts.
*480 Effective September 1, 1979, CIGNA issued reinsurance certificates to OIL, covering various layers of its umbrella policy to O-I.
Solicitations were made to other reinsurers. On September 3, 1979, ERML requested additional information from ARMS concerning the status of claims against O-I. ERML asked an ARMS' representative if he could "confirm" that O-I had "no asbestos exposure." In the responding telex, ARMS wrote "no" adjacent to the words "no asbestos exposure." Johnson later met with James Blackstone, the attorney who handled ARMS' casualty claims. According to Johnson, pending asbestos claims were discussed with Blackstone, who stated that he was "working for the reinsurers."

G. 1980: O-I'S FORMAL NOTIFICATION OF ITS ASBESTOS EXPOSURE
In late 1979, O-I began receiving an increasing number of asbestos claims and it feared the manifestation dates might implicate its post-1977 insurers. In January 1980, O-I created a three million dollar reserve, based on the asbestos claims information it then possessed. Aetna refused to reimburse O-I for the claims it had submitted.
On July 15, 1980, Johnson wrote General and provided certain information about the renewal of O-I's insurance which it was seeking through ARMS. Johnson disclosed that O-I had manufactured Kaylo and had been sued by various workers for asbestos exposure. He generally outlined the cost of the claims to that date, and described Aetna's position that each claim constituted a separate "occurrence" for purposes of the $250,000 SIR. In other words, Aetna's policies were implicated only to the extent that each separate asbestos claim exceeded O-I's $250,000 SIR. Johnson further advised General that it might eventually present claims to United and the excess carriers based upon the thesis that, regardless of the date the claimants were exposed to Kaylo, injuries became manifest after September 1, 1979, when the new insurance scheme went into effect.
*481 On July 30, 1980, O-I sent its first written notice to American Risk concerning the mounting asbestos claims. That notice read in pertinent part as follows:
We are giving notice of a potential claim under our Products Liability Policies written by United subject to a $250,000 retention. If our claim settlements and legal costs exceed $250,000 in a given policy year, we will look to United, and possibly the Umbrella carriers, for reimbursement. Therefore, we suggest that the Umbrella carriers also be put on notice.
O-I also stated that it had previously notified Aetna of the pending asbestos claims, but that O-I was adopting the position that the insurance in effect on the date that the injury or damage became manifest was to control. At that time, O-I was marshalling information as to the manifestation dates of the pending claims, and stated that "in the near future" it hoped to be able to "advise which of the approximate[ly] 2,000 cases filed to date would be insured under the United policies."
On August 6, 1980, Roger Greiner, General's assistant vice-president, wrote to Johnson to confirm their conversation of the previous day in which General agreed to renew fifty percent of the first five million dollar umbrella layer and 100% of the next five million dollars. However, Greiner stated that General's "renewal ... [would] specifically exclude all asbestos exposure." On August 11, 1980, ARMS' claims attorney forwarded a copy of Johnson's July 30 notice, which we quoted previously, to OIL and United. The attorney also observed that ARMS would take the position that the "exposure" theory applied to the policies in question. On August 13, 1980, CIGNA "was informed of [O-I's] exposure to asbestos-related lawsuits." On August 18, 1980, CIGNA sent ARMS its "renewal authorization[]," but emphasized that "[t]his authorization assumes exclusion of liability arising out of asbestos."
Also on August 18, 1980, a representative of General met with Johnson and engaged in a "brief general review ... of the blocks of asbestos litigation around the country in which [O-I] [was] ... involved." On August 26, 1980, General offered O-I a funding plan for its asbestos coverage. Under General's plan, it would insure fifty percent of the first five million dollar layer of O-I's *482 umbrella and 100% of the second layer but would be "reimbursed for all asbestos losses ... by [O-I]" on the basis of an agreed upon formula. According to General's letter, its offer did not "affect any coverage O-I had before September 1, 1980." Nor did it affect the renewal of the remainder of O-I's insurance "for which [General] previously negotiated" and which, General claimed, excluded asbestos risks.
In September 1980, Johnson reported to OIL's board of directors that its renewal of coverage by IRML had been completed "with the exception of asbestos exposure," which apparently remained an open question. Later that month, OIL notified General that O-I had been named as a defendant in 2,400 asbestos-related actions. OIL noted that, under the exposure theory, it was not responsible for any of these claims. OIL also observed that, in any event, "each claim would be subject to [O-I's $250,000 SIR], which, in effect, literally guarantee[d] that [its] policy [would] never be touched." OIL further related the amounts of settlement payments and defense costs to date. ARM International, on behalf of OIL, also provided CIGNA with this information. Allstate was notified of OIL's report by IRML.
On November 20, 1980, ARMS' Blackstone wrote to Johnson, confirming their prior discussions concerning the positions which United and OIL would take with respect to the "exposure versus manifestation" theories. Blackstone enclosed drafts of the proposed letters and suggested, at Johnson's behest, that United and OIL "leave the question `open' without waiving any rights to later assert either theory." Nevertheless, Blackstone noted that "so long as the industry-wide dispute exists respecting the two theories," United and OIL would be "compelled to adopt the exposure theory."
We pause to make several editorial comments. As the proportions of the asbestos problem gradually became known, the insurers and reinsurers began jockeying for position. Because Aetna was the principal insurer at the time various claimants were exposed to Kaylo, it insisted that only manifestation of the injury *483 or damage triggered the duty to indemnify and defend. In contrast, United, OIL and the reinsurers adopted the argument that exposure to asbestos was the triggering event. The insurers pursued another line of defense as well. Specifically, they asserted that each individual claim was subject to O-I's $250,000 SIR. The battle lines and the insurers' focus later shifted to exclusions contained in subsequent policies.

H. INSURANCE POLICY EXCLUSIONS: 1981 TO 1983
Exclusions pertaining to asbestosis or asbestos-related risks began to appear in late 1980. For example, on October 9, 1980, General issued its 1980-1981 reinsurance certificates with an endorsement that the policy "does not provide coverage for any claims arising from asbestosis." In September 1983, General changed the endorsement to exclude "claims arising from asbestos," and purportedly back-dated the exclusion to September 1, 1980. On January 9, 1981, CIGNA issued reinsurance certificates which provided that coverage "does not apply to asbestosis, or other personal injury arising out of exposure to asbestos products or materials."
In a rather confusing manner, OIL followed suit. As we mentioned earlier Endorsement 2 in OIL's policy provided coverage "as broad as" the underlying primary insurance even if its, OIL's, policy contained an exclusion barring the risk. This endorsement was retained. However, on May 26, 1981, OIL forwarded an additional endorsement which deleted an exclusion for workers' compensation-type injuries. The second part of Endorsement 17 added a new exclusion, 2.2J, which barred coverage respecting "asbestosis or other personal injury arising out of exposure to asbestos products or materials."
Endorsement 17 and its relation to the "as broad as" clause was the subject of numerous discussions. On August 18, 1981, ARMS wrote to Johnson and requested a meeting concerning the 1981-1982 renewal. In its letter, ARMS noted that the umbrella was "unclear as regards the handling of product liability claims." Significantly, ARMS mentioned the exclusion in Endorsement 17 *484 for asbestos-related claims and suggested that it "could well be negated" by the "as broad as" clause in Endorsement 2. ARMS suggested that either Endorsement 2 "be amended to clarify the intent not to affect specific conditions of the umbrella policy" or "O-I's willingness to accept exclusions [be] attached to the certificates of reinsurance." Johnson's response was non-committal. In his deposition testimony, Johnson acknowledged the "apparent" inconsistency between Endorsements 2 and 17, but nevertheless recounted his belief that O-I was covered for asbestos-related risks. In any event, the parties did not address the issue further.
The matter remained dormant until November 1, 1982. On that date, ARMS wrote what can fairly be characterized as a carefully worded letter, "confirming prior discussions" so as to clarify that the "as broad as" clause in the umbrella policy did not include asbestos coverage. ARMS presented one of the proposed amendments as follows:
Endorsement # 2  Deleted and replaced as follows:
It is agreed that Endorsement # 2 is deleted in its entirety and replaced by the following:
It is understood and agreed that if any policy of underlying liability insurance applies to an occurrence excluded by the provisions of any exclusions stated in Section 2.2 of this policy, the insurance afforded by this policy shall apply to such occurrence notwithstanding such exclusion except 2.2D and 2.2J. [Emphasis added].
ARMS also proposed that the SIR language be altered. The amended version was to read, "$250,000 SIR [for] each and every loss." While noting its belief that the proposed amendments comported with prior discussions, ARMS suggested that OIL "effect the necessary documentation" to implement the changes following O-I's "review and concurrence." Predictably, on November 9, 1982, O-I contacted ARMS and observed that it had never agreed to the proposals contained in ARMS' prior letter. In subsequent correspondence, ARMS acknowledged that O-I had never agreed to the proposed changes, and that the subject should be further "research[ed]."
These inquiries proceeded at a desultory pace until May 6, 1983, when OIL sent O-I Endorsement 21 which, on its face, deleted *485 Endorsement 2 and substituted a new "as broad as" clause which was expressly limited by Exclusion 2.2J of the umbrella. The new endorsement unmistakably excluded asbestos coverage. According to its terms, the exclusion was to be effective retroactively, as of September 1, 1982. O-I did not respond.
For reasons not fully expressed in the record, O-I's policies with OIL and United were not renewed after September 1, 1985, and O-I contracted with another carrier effective that date.

I. O-I'S DECLARATORY JUDGMENT ACTION
On November 30, 1984, O-I filed a complaint against United, OIL and General, seeking a declaration of its rights under the policies in question. Specifically, O-I sought to compel United to defend and indemnify it for asbestos-related bodily injury and property damage claims made against it by third parties. O-I asserted that OIL was liable under its umbrella policies for the claims which exceeded United's coverage. Alternatively, O-I requested damages from ARMS for professional malpractice. Additionally, O-I sought damages from General, alleging tortious interference with economic rights. Allstate and CIGNA were granted leave to intervene.
We need not recount at length the protracted discovery proceedings that followed or the numerous interlocutory orders that were entered. On January 17, 1990, the Chancery Division entered an order, scheduling summary judgment motions and trial. Pursuant to the scheduling order, O-I, OIL, United, Allstate and CIGNA filed motions for summary judgment.
On April 6, 1990, the Chancery Division rendered an oral opinion, directing that summary judgment be entered in favor of O-I against United and OIL. We will describe the court's exhaustive opinion in detail when we discuss the merits of the issues raised. In brief, the court determined that the insurance policies and reinsurance certificates provided coverage for all asbestos-related third party claims against O-I. The court also decided in favor of O-I and OIL with respect to cross-claims filed by United *486 and the reinsurers, which alleged fraudulent inducement, nondisclosure and concealment, and which demanded rescission or reformation. The court concluded that the insurer and reinsurers had waived their fraud defenses. The court determined that the defendants were jointly and severally liable and that the claims could not feasibly be prorated. The order was certified as final pursuant to R. 4:42-2. These appeals and cross-appeals followed. On February 11, 1991, we granted American's motion to intervene.
Because of the magnitude of the financial interests at stake and the difficulty of the issues presented, the parties have filed voluminous briefs raising a multitude of arguments and counterarguments. We do not intend to comment on all of the issues raised. Instead, we confine ourselves to what we perceive to be the critical questions in the case. We examine these issues in three parts. First, we address questions concerning the construction of the insuring agreements. We then turn to the manner in which the policies are to be applied. Finally, we discuss the questions of fact that, in our view, require a plenary hearing.

II. THE INSURING AGREEMENTS
Certain prefatory comments are in order pertaining to the parties' arguments respecting interpretation of the insurance policies. Much of the parties' briefs is devoted to whether O-I, as a sophisticated insured, should benefit from the principles that normally guide the courts in construing insurance policies.
In the context of the average insured, it has long been established that while insurance policies are contractual in nature, they are not ordinary agreements. Instead, they are considered "contracts of adhesion between parties who are not equally situated." Meier v. New Jersey Life Ins. Co., 101 N.J. 597, 611, 503 A.2d 862 (1986) (citing Allen v. Metropolitan Life Ins. Co., 44 N.J. 294, 305, 208 A.2d 638 (1965)). To that extent, insurance contracts are "unipartite in character," having been drafted by the company's experts, "[people] learned in the law of insurance." Mazzilli v. Accident & Cas. Ins. Co. of Winterthur, 35 N.J. 1, 7, 170 A.2d *487 800 (1961). Thus, it is not unfair that the insurer "bear the burden of any resulting confusion." Gaunt v. John Hancock Mut. Life Ins. Co., 160 F.2d 599, 602 (2nd Cir.), cert. denied, 331 U.S. 849, 67 S.Ct. 1736, 91 L.Ed. 1858 (1947). These circumstances long ago fathered the principle that any doubt as to the existence or extent of coverage must generally be resolved in favor of the insured. Mazzilli v. Accident & Cas. Ins. Co. of Winterthur, 35 N.J. at 8, 170 A.2d 800. "Our courts have adopted the principle giving effect to the `objectively reasonable expectations' of the insured for the purpose of rendering a `fair interpretation' of the boundaries of insurance coverage." Meier v. New Jersey Life Ins. Co., 101 N.J. at 612, 503 A.2d 862 (quoting Di Orio v. New Jersey Mfrs. Ins. Co., 79 N.J. 257, 269, 398 A.2d 1274 (1979)). See also Longobardi v. Chubb Ins. Co. of New Jersey, 121 N.J. 530, 537, 582 A.2d 1257 (1990); Walker Rogge, Inc. v. Chelsea Title & Guar. Co., 116 N.J. 517, 529, 562 A.2d 208 (1989), appeal after remand, 254 N.J. Super. 380, 603 A.2d 557 (App.Div. 1992); Allen v. Metropolitan Life Ins. Co., 44 N.J. at 305, 208 A.2d 638; Kievit v. Loyal Protect. Life Ins. Co., 34 N.J. 475, 482, 170 A.2d 22 (1961). Of course, the principle "is, and indeed always has been, one of construction, simply an aid to the proper interpretation of terms devised by the professional underwriter." Weedo v. Stone-E-Brick, Inc., 81 N.J. 233, 246, 405 A.2d 788 (1979). See also Longobardi v. Chubb Ins. Co. of New Jersey, 121 N.J. at 537, 582 A.2d 1257; Walker Rogge, Inc. v. Chelsea Title & Guar. Co., 116 N.J. at 529, 562 A.2d 208. "[T]he words of an insurance policy should be given their ordinary meaning, and in the absence of an ambiguity, a court should not engage in a strained construction to support the imposition of liability." Longobardi v. Chubb Ins. Co. of New Jersey, 121 N.J. at 537, 582 A.2d 1257; Voorhees v. Preferred Mut. Ins. Co., 128 N.J. 165, 175, 607 A.2d 1255 (1992). Only genuine interpretational difficulties engage the doctrine of ambiguity. See Weedo v. Stone-E-Brick, Inc., 81 N.J. at 247, 405 A.2d 788.
The principles favoring the interests of the insured are less persuasive in the context of a large, skilled corporation. See *488 Werner Indus., Inc. v. First State Ins. Co., 112 N.J. 30, 38, 548 A.2d 188 (1988). The knowledge and sophistication of an insured may be a factor in determining whether an insurance policy is a "contract of adhesion." Ibid. Although several courts have held that a sophisticated insured should be treated no differently than its less urbane counterpart, see, e.g., Oritani Sav. & Loan v. Fidelity & Deposit, 744 F. Supp. 1311, 1315 (D.N.J. 1990), rev'd, 989 F.2d 635 (3d Cir.1993); Leksi, Inc. v. Federal Ins. Co., 736 F. Supp. 1331, 1336 (D.N.J. 1990); Vargas v. Calabrese, 714 F. Supp. 714, 720, 726 (D.N.J. 1989), aff'd, 949 F.2d 665 (3d Cir.1991), others have suggested that large commercial entities should not be permitted to benefit from whatever deficiencies might be uncovered in the policy language from the perspective of an unschooled and unwary policyholder, see McNeilab, Inc. v. North River Ins. Co., 645 F. Supp. 525, 546 (D.N.J. 1986), aff'd, 831 F.2d 287 (3d Cir.1987); see also Compagnie Des Bauxites De Guinea v. Insurance Co. of N. Am., 794 F.2d 871, 875 (3d Cir.1986). While our research discloses no reported New Jersey decision dealing with the precise issue, other jurisdictions have held that "the exception to the strict rule of construction applies only when the terms of the policy were negotiated between the parties...." Bank of West v. Superior Court, 225 Cal. App.3d 121, 136, 275 Cal. Rptr. 39, 47 (1990), vacated, 4 Cal. App.4th 1622, 277 Cal. Rptr. 219 (1991), rev'd on other grounds, 2 Cal.4th 1254, 10 Cal. Rptr.2d 538, 833 P.2d 545 (1992). Stated somewhat differently, only where it is clear that an insurance policy was "actually negotiated or jointly drafted," and where the policyholder had bargaining power and sophistication, is the rule of strict construction of policy terms against the insurer not invoked. AIU Ins. Co. v. FMC Corp., 51 Cal.3d 807, 823, 274 Cal. Rptr. 820, 832, 799 P.2d 1253, 1265 (1990). See also Keating v. National Union Fire Ins. Co., 754 F. Supp. 1431, 1437 (C.D.Cal. 1990); Northwest Airlines, Inc. v. Globe Indem. Co., 303 Minn. 16, 26, 225 N.W.2d 831, 837 (1975); Boeing Co. v. Aetna Cas. and Sur. Co., 113 Wash.2d 869, 882-83 784 P.2d 507, 514 (1990).
*489 Against this backdrop, we recognize that the policies issued by United and OIL were not contracts of adhesion, and that various parts were the subject of negotiations and were jointly drafted. O-I was a sophisticated insured and cannot seek refuge in the doctrine of strict construction by pretending it is the corporate equivalent of the unschooled, average consumer. However, our recognition of O-I's sophistication does not change the result reached by the Chancery Division. We have considered the extrinsic evidence contained in the record in our efforts to discern the objectively reasonable expectations of the parties and the landscape of risk contemplated by the policies. So posited, we are in complete accord with the Chancery Division's decisions regarding the boundaries of coverage.

A. EXCLUSION J IN THE UNITED POLICY
Initially, we agree with the Chancery Division's decision that Exclusion J in the United policy did not bar coverage for risks relating to O-I's asbestos products. We previously described the policy in some detail. To reiterate, the United policy repeatedly refers to "products liability" coverage. The policy jacket, cover page and declaration sheets all assert coverage for "products." Endorsements 12, 17, 18, 21 and 24 set forth separate premiums for "[p]roducts [l]iability" coverage. Moreover, Endorsement 23 names Sears as an additional insured under United's existing "[p]roducts [l]iability [i]nsurance" for glassware. Although Exclusion J purports to bar coverage under the "products hazard" unless the injury or damage "arises out of the sale or distribution of electricity, gas, food or beverages by the named insured," it is undisputed that O-I neither manufactured nor sold these commodities.
The genesis of Exclusion J can be traced to the Aetna primary policy in effect prior to September 1, 1977. The Aetna primary policy contained a products hazard exclusion, also denominated Exclusion J, which was identical to that contained in the United policy. As we noted earlier, the Aetna program also included an *490 excess indemnity umbrella policy. Aetna's umbrella policy attached at the one million dollar level, with one exception; the policy had a "drop-down" feature which provided broad product liability coverage in excess of the $250,000 per occurrence SIR. Therefore, the Aetna program afforded both general liability coverage and normal product liability coverage; the former being provided both by the primary and umbrella policies, and the latter deriving from the umbrella.
In soliciting insurers for participation in the post-September 1, 1977 insurance program, O-I stressed that the insurers were required to "duplicate" O-I's "existing coverage" and provide protection "no less than" that which had previously been afforded by the Aetna policies. United and OIL accepted ARMS' proposal on this basis. United then provided the primary policy and OIL provided excess umbrella coverage. ARMS prepared the United and OIL policies based on "mark-ups" of the expiring Aetna policies. Although evidence was presented indicating that the "marked up" Aetna policies were revised to delete Exclusion J, ARMS' failure to excise this exclusion was not discovered until much later. The simple and overriding fact is that all parties behaved consistently with the understanding that the United policy afforded broad product liability coverage. Also perfectly plain is the fact that Exclusion J is inconsistent with the remainder of the United policy which faithfully tracked the parties' repeatedly expressed intent.
Despite this compelling evidence, United asserts that its policy excluded asbestos risks. United's position ignores the fundamental rule that an insurance contract must be interpreted by considering the agreement as a whole, see Prather v. American Motorists Ins. Co., 2 N.J. 496, 502, 67 A.2d 135 (1949), and that whenever possible, meaning must be given to all of its parts, Goldberg v. Commercial Union Ins. Co. of N.Y., 78 N.J. Super. 183, 190, 188 A.2d 188 (App.Div. 1963); Bullowa v. Thermoid Co., 114 N.J.L. 205, 210, 176 A. 596 (E. & A. 1935); Maryland Cas. Co. v. Hansen-Jensen, Inc., 15 N.J. Super. 20, 27, 83 A.2d 1 (App.Div. *491 1951). It disregards the negotiations between the parties in which the insurers promised to provide broad coverage for risks related to O-I's products. See Farese v. McGarry, 237 N.J. Super. 385, 394, 568 A.2d 89 (App.Div. 1989); Kearney & Trecker Corp. v. Master Engraving Co., 211 N.J. Super. 376, 381, 511 A.2d 1227 (App.Div. 1986), rev'd on other grounds, 107 N.J. 584, 527 A.2d 429 (1987); In re Voorhees, 93 N.J. Super. 293, 298, 225 A.2d 710 (App.Div. 1967); Garden State Plaza Corp. v. S.S. Kresge Co., 78 N.J. Super. 485, 496-97, 189 A.2d 448 (App.Div.), certif. denied, 40 N.J. 226, 191 A.2d 63 (1963). It also discounts unrefuted evidence that product liability claims were paid under the policy. See Michaels v. Brookchester, Inc., 26 N.J. 379, 388, 140 A.2d 199 (1958); Journeymen Barbers, etc., Local 687 v. Pollino, 22 N.J. 389, 394-95, 126 A.2d 194 (1956); Joseph Hilton & Assocs., Inc. v. Evans, 201 N.J. Super. 156, 171, 492 A.2d 1062 (App.Div.), certif. denied, 101 N.J. 326, 501 A.2d 977 (1985); Medivox Prod., Inc. v. Hoffman-LaRoche, Inc., 107 N.J. Super. 47, 61, 256 A.2d 803 (Law Div. 1969). And it overlooks the undisputed fact that O-I paid substantial premiums for product liability coverage.
We will not tarry with a lengthy discussion of United's highly technical arguments which wholly obfuscate the purpose of our inquiry. Summoning arcane constructional aids, "some as dated and as irrelevant as Roman law," see Diamond Shamrock Chemicals v. Aetna, 258 N.J. Super. 167, 242, 609 A.2d 440 (App.Div. 1992), United seeks to deny what the uncontradicted evidence plainly shows; its policy was intended to cover product liability risks. In plain language, United has adopted the unholy mantra, "we collect premiums; we do not pay claims." We recognize that this is a harsh judgment. It is nonetheless warranted by the record before us.
We seek to give effect to the clear intent of the parties. The small print of exclusion should not be magnified to deny to the insured the protection bought and paid for with substantial premiums. We hold that Exclusion J did not bar coverage for asbestos-related claims.

*492 B. ENDORSEMENTS 2 AND 17 IN THE OIL POLICIES
We also reject the arguments of OIL and the reinsurers that Endorsement 17 effectively excluded asbestos-related risks. As we noted earlier, Endorsement 2, which contains the "as broad as" clause, was a critical part of the OIL umbrella policy from its inception. This provision stated:
It is agreed that if any policy of Underlying Liability Insurance applies to an occurrence excluded by the provisions of any exclusion stated in section 2.2 [i.e., the "Exclusions" portion of the policy], the insurance afforded by this policy shall apply to such occurrence notwithstanding such exclusion....
Endorsement 17, which OIL added on May 26, 1981, provided a new exclusion, 2.2J, which barred coverage for "asbestosis or other personal injury arising out of exposure to asbestos products or materials." The Chancery Division concluded that by adding this exclusion OIL automatically triggered Endorsement 2, resulting in umbrella protection for asbestos-related risks covered under United's primary policy. We agree.
We do not find these provisions mutually repugnant or inconsistent. Endorsement 17 did not establish an absolute exclusion of the kind set forth in other portions of the OIL policy. Instead, it established an exclusion under 2.2, which was subject to the "as broad as" clause contained in Endorsement 2. Although OIL now claims that the "as broad as" provision should be ignored as a "technical inconsistency," we are obliged to give effect to all parts of the policy, if possible. By its very terms, Endorsement 17 states that the excess umbrella policy is to track the underlying insurance and afford consistent coverage, "notwithstanding" the exclusions set forth in "section 2.2." The policy language is crystal clear. We do no more than follow it.
Our reading of Endorsement 17 does not ignore its meaning or purpose, as defendants contend. As pointed out by O-I in its brief, any section 2.2 exclusion  including 2.2J  provided added protection to the excess insurer (and the reinsurers) that the policyholder will maintain its underlying coverage. As long as the underlying insurance was in place, the insured had the benefit of both primary and umbrella coverage. If, however, the insured *493 failed to maintain underlying coverage, the 2.2 exclusions would prevent the umbrella from "dropping down" to cover a loss not included in the primary policy. Section 2.2 exclusions essentially safeguarded the position of OIL (and the reinsurers) by restricting their loss exposure.
The significance of Endorsement 17 to the insurers in 1980 is thus understandable. Their response to O-I's asbestos claims was to deny coverage on two theories: (1) that coverage was triggered only by exposure to asbestos-containing products, and (2) that each asbestos-related personal injury claim was a separate occurrence, and as a result, an individual claim would have to exceed the $250,000 SIR before the insurers would have to supply a nickel of coverage. Under the second theory, Endorsement 17 restricted OIL's exposure to pay asbestos claims to individual cases exceeding one million dollars, because its umbrella would not drop down if the United policy did not provide primary coverage. In light of the history of O-I settlements below $250,000, it was incomprehensible that any single case would approach the one million dollar level.
Accordingly, Endorsement 17 is not a meaningless provision. Instead, it comported with the insurers' stance that each asbestos-related personal injury constituted an occurrence, and it was operable even in the absence of underlying coverage. For these reasons, defendants' argument that the underlying intent of Endorsement 17 requires us to interpret it to exclude more than it literally proscribes cannot be sustained.
The insurers' argument also fails to account for the addition of Endorsement 21 in 1983. We previously described this endorsement in our recitation of the facts. Stripped to its essentials, Endorsement 21 excepted from the "as broad as" clause both pollution and asbestos-related risks. Defendants now argue that the primary reason for Endorsement 17 was to remove pollution claims from the umbrella, and that the asbestos exclusion was somehow included to "go along for the ride." However, it appears that pollution claims  unlike asbestos bodily injury risks  had *494 been excluded from both the primary and excess policies long before Endorsement 21 was added. Specifically, Exclusion 1B in the primary policy barred coverage for personal injury and property damage "arising out of the discharge" of various pollutants. Exclusion 2.2D in the OIL policy prevented the umbrella from "dropping down" to afford coverage for pollution risks. In short, the purpose of Endorsement 21 is manifest. It was designed to exclude asbestos-related risks from coverage. Clearly, Endorsement 21 would not have been necessary had Endorsement 17, and more specifically Exclusion 2.2J, already fulfilled that aim. The simple answer is that Endorsement 17, and Exclusion 2.2J, were not designed to exclude asbestos-related claims from OIL's policy unless they were not covered under the primary policy. Nor did these provisions have that effect.
We recognize that there is some extrinsic evidence in the record indicating that perhaps OIL believed Exclusion 2.2J barred coverage for asbestos claims. Whatever subjective beliefs some of the insurers might have harbored, we are bound by the policy's crystal clear language. We do not regard the endorsements as ambiguous. In unmistakable language, the "as broad as" clause of Endorsement 2 commands that the coverage provided by the underlying policy is paramount to any exclusion contained in section 2.2. We do no more than apply and enforce the plain language of the "as broad as" clause.
As to the reinsurers, we are mindful of the fact that reinsurance involves no privity between the original insured and the reinsurer. See, e.g., Credit Managers Ass'n v. Kennesaw Life & Acc. Ins. Co., 809 F.2d 617, 621-22 (9th Cir.1987); A/S Ivarans Rederei v. Puerto Rico Ports Auth., 617 F.2d 903, 905 (1st Cir.1980). Reinsurance does not confer on the original insured the status of a third party beneficiary. A/S Ivarans Rederei v. Puerto Rico Ports Auth., 617 F.2d at 905. The reinsurers ask rhetorically how were they to know that the product hazard exclusion contained in the United policy, and Endorsement 17's reference to section 2.2J in the OIL policy did not exclude *495 asbestos-related risks. The answer is simple. They should have reviewed Endorsement 2's command that section 2.2 exclusions in the OIL policy did not control where the underlying policy afforded the insured protection against the risk. Further, they should have examined the United policy which repeatedly referred to product liability coverage. While we recognize that the reinsurers were not bound by the burden of a due diligence inquiry in their relationship with the ceding insurer, see Sun Mut. Ins. Co. v. Ocean Ins. Co., 107 U.S. 485, 510, 1 S.Ct. 582, 599-600, 27 L.Ed. 337, 345 (1883), they nevertheless were obliged to examine both the primary and excess policies to determine the nature of the risk they were to assume. We discern no mutual mistake sufficient to abrogate the plain terms of these policies.

C. EFFECTIVE DATE OF ENDORSEMENT 21
Endorsement 21 excluded coverage for asbestos-related risks from the "as broad as" clause contained in Endorsement 2. The Chancery Division found that Endorsement 21 became effective on its issuance date, May 6, 1983, rather than its stated effective date, September 1, 1982. In a footnote to the Chancery Division's order, the court explained that the exclusion created by Endorsement 21 was not preceded by a binder or a telex which would "justify its retroactive application to September 1, 1982." United and American assert that the endorsement is clear on its face and that extrinsic evidence supports the conclusion that O-I agreed to the September 1, 1982 effective date.
We are in accord with the Chancery Division's determination that Endorsement 21 should be applied prospectively from its issuance date, May 6, 1983. We need not describe in detail the extrinsic evidence that, according to the defendants, supports the claim that the endorsement was intended to be applied retroactively. Much of this evidence consists of a series of letters from ARMS to O-I between August 1981 and August 1982. However, we regard this evidence as inconclusive. Other proofs reveal that the proposed endorsement was not even communicated to O-I until November 1982.
*496 We have carefully considered defendants' argument that Endorsement 21 was not a retroactive exclusion of coverage, but instead a confirmation of the scope of insurance as of the renewal date. We also acknowledge that "the effective date of a modification will [often] be determined by [its] terms." Martz v. Union Labor Life Ins. Co., 757 F.2d 135, 138 (7th Cir.1985). However, in the absence of a meeting of the minds, "[m]erely mailing the exclusion clause to the insured without explanation [is] not sufficient to effectuate ... modification of the insurance contract...." United States v. National Ins. Underwriters, 266 F. Supp. 636, 638 (D.Minn. 1967). Succinctly stated, defendants' unilateral attempt to modify coverage, without the insured's express or implied consent and without consideration, must fail. See, e.g., 13A Appleman, Insurance Law & Practice, § 7602 (1976); see also Hilt Truck Lines, Inc. v. Riggins, 756 F.2d 676, 678 (8th Cir.1985); Dixie Auto Ins. Co. v. Steele, 288 Ala. 459, 262 So.2d 283 (1972); March v. Snake River Mut. Fire Ins. Co., 89 Idaho 275, 404 P.2d 614 (1965).

D. GENERAL'S ENDORSEMENTS 2 AND 3
General's Endorsement 2, which was issued in October 1980, but which on its face applied retroactively to September 1980, provided in pertinent part:
In consideration of the premium charged, it is understood and agreed that this certificate does not provide coverage for any claims arising from or due to asbestosis.
In 1981 and 1982, General also issued endorsements incorporating the same "asbestosis" language. In 1983, General issued Endorsement 3, which substituted the word "asbestos" for "asbestosis." This latter endorsement purported to amend the 1980, 1981 and 1982 endorsements and to apply retroactively. The Chancery Division determined that the endorsements issued between 1980 and 1982, by their terms, excluded only "asbestosis" and not other asbestos-related risks. The court did not expressly decide whether General's 1983 Endorsement 3 was to apply retroactively.
We agree with the Chancery Division's conclusion that the earlier "asbestosis" exclusions did not embrace other asbestos-related *497 risks. The clauses were drafted by General. Had General wished to exclude all asbestos-related risks, it could have so provided. For decades, the courts have recognized what the medical community has long known; asbestosis is a specific disease different from other asbestos-related illnesses. See, e.g., Borel v. Fibreboard Paper Prods. Corp., 493 F.2d at 1083-84; Insurance Co. of N. Am. v. Forty-Eight Insulations, Inc., 451 F. Supp. 1230, 1237 (E.D.Mich. 1978), aff'd, 633 F.2d 1212 (6th Cir.1980), cert. denied, 454 U.S. 1109, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981), reh'g denied, 455 U.S. 1009, 102 S.Ct. 1648, 71 L.Ed.2d 878 (1982); Utter v. Asten-Hill Mfg. Co., 453 Pa. 401, 405-06, 309 A.2d 583, 585-86 (1973). Instead of an all-inclusive exclusion, the 1981-1982 endorsements barred coverage only with respect to "asbestosis," a specific and identifiable disease. The language used is absolutely plain. However, even if we were to somehow consider the language ambiguous, the critical circumstance is that the confusion was caused by wording selected by the insurer. See Broadwell Realty v. Fidelity & Cas., 218 N.J. Super. 516, 536, 528 A.2d 76 (App.Div. 1987). "We necessarily consider the fact that `alternative or more precise' wording, if used, `would have put the matter beyond reasonable question.'" Ibid. (quoting Mazzilli v. Accident & Cas. Ins. Co. of Winterthur, 35 N.J. at 7, 170 A.2d 800). If the language created an ambiguity, it must be resolved against General.
We do not regard General's allusion to extrinsic evidence as persuasive. Clearly, this evidence did not rise to the level of proof which has prompted several courts to construe the word "asbestosis" as encompassing all asbestos-related risks. See, e.g., Carey Canada Inc. v. California Union Ins. Co., 720 F. Supp. 1018 (D.D.C. 1989), aff'd in part, vacated in part, 940 F.2d 1548 (D.C. Cir.1991). We are satisfied from our examination of the record that as early as 1978, General understood that asbestosis represented only one of several diseases produced by asbestos exposure. Although the words "asbestosis" and "asbestos" were occasionally used interchangeably, we are convinced that the parol *498 evidence contained in the deposition transcripts was not sufficient to create a genuine issue of material fact.
We also conclude that General's unilateral modification of coverage by a back-dated endorsement purporting to broaden earlier exclusions should not be given effect. As noted earlier, the modification of an insurance policy certificate is not effective unless it is consented to by the insured. See 17 Couch on Insurance 2d, § 65:17 (rev. ed. 1983). General's Endorsement 3 may be applied only prospectively.

E. CIGNA'S EXCLUSIONS
Although the briefs are somewhat confusing on this point, we gather that neither O-I nor OIL challenges CIGNA's assertion that its coverage, including the asbestos-related exclusion, became effective on September 1, 1980, pursuant to August 1980 telexes between ARM International and CIGNA. At issue, however, is whether the exclusion for asbestos-related risks carried over into subsequent years. CIGNA's 1981, 1982 and 1983 reinsurance certificates contain no asbestos exclusion. The 1980 certificate, which contained the exclusion, expired by its terms on September 1, 1981.
This point was not considered by the Chancery Division. CIGNA's response to the cross-appeal is that it relied upon OIL's Endorsement 17 in subsequent years. We previously held that Endorsement 17 was subject to the "as broad as" clause contained in Endorsement 2. We are thus strongly inclined to exercise our original jurisdiction pursuant to R. 2:10-5 and modify the Chancery Division's order to reflect that the exclusion contained in CIGNA's 1980 reinsurance certificate expired on September 1, 1981. However, because a remand is otherwise required, we take the more prudent course and direct the Chancery Division to consider and resolve this question.

F. THE $250,000 SIR
We now turn to the insurers' argument that the $250,000 SIR should have been applied to each individual claim. The *499 Chancery Division rejected the insurers' position and concluded that the SIR applied once per policy period. We agree with that interpretation of the policy language.
The insurers' contention rests upon language contained on the second page of declarations attached to the United policy, stating that O-I is "[s]elf-insured for the first $250,000 of each loss." However, the significance of this isolated reference to loss is reduced considerably by an examination of the remainder of the United and OIL policies. For example, item 5 in the declarations of the United policy indicates that the SIR is to be applied on an "occurrence" basis. Moreover, the policy itself repeatedly refers to a "self-insurance retention of $250,000/occurrence." The policy also states, "[f]or the purpose of determining the limit of the [c]ompany's liability, all personal injury and property damage arising out of continuous or repeated exposure to substantially the same conditions shall be considered as arising out of one occurrence."
The "single occurrence" interpretation is also supported by United's promise to indemnify O-I for "all sums which [O-I] shall become legally obligated to pay ... as damages because of personal injury or property damage ... caused by an occurrence." The United policy defines an "occurrence" as "an accident, including injurious exposure to conditions, which results in bodily injury or property damage." The OIL policy is also replete with references to an occurrence which triggers coverage. That policy requires OIL to indemnify O-I for "[its] ultimate net loss in excess of the applicable underlying limit which [O-I] shall become legally obligated to pay as damages because of ... personal injury [or] property damage ... caused by an occurrence." The OIL policy separately defines "occurrence" as "an accident, including continuous or repeated exposure to conditions, which results in personal injury [or] property damage." In light of all this, we conclude that the SIR was intended to apply to each "occurrence," not each "loss."
*500 That does not end our inquiry. The insurers assert that the word "occurrence" refers to the injury or damage caused by a product and, therefore, the $250,000 should be applied to each and every claim. In support of their contention, they point to extrinsic evidence which discloses that O-I intended to increase the monetary amount of self-insurance. They refer specifically to portions of deposition testimony by O-I's Johnson. While it is clear that one of O-I's purposes in adopting the new insurance plan in 1977 was to reduce premiums by increasing the amount of self-insurance, the evidence referred to by the insurers is otherwise unpersuasive.
We agree with the Chancery Division's finding that claims against O-I arose "out of a series of interrelated acts ... and that they should be treated as a single [occurrence] or loss for the purpose of calculating the deductible." If adopted, the insurers' position would completely nullify O-I's coverage  both primary and excess  for all but those few individual personal injury and property damage claims which exceed the $250,000 self-insured retention or deductible. We do not believe that this was the parties' intent.
Contrary to the insurers' contention, Hartford Acc. & Indem. Co. v. Aetna Life & Cas. Ins. Co., 98 N.J. 18, 483 A.2d 402 (1984) does not compel a different conclusion. There, the Court observed that "[a]s a general rule the time of the `occurrence' of an accident within the meaning of an indemnity policy is not the time the wrongful act was committed but the time when the complaining party was actually damaged." Id. at 27, 483 A.2d 402 (quoting Muller Fuel Oil Co. v. Insurance Co. of N. Am., 95 N.J. Super. 564, 578, 232 A.2d 168 (App.Div. 1967)). However, the quoted language refers to the time when a claim becomes manifest for the purpose of determining whether the occurrence falls within the policy period, a point we will consider shortly. The issue here is entirely different. The question presented in this case concerns the number of occurrences for the purpose of determining whether deductibles should be aggregated.
*501 In Diamond Shamrock Chemical v. Aetna, 258 N.J. Super. at 226-27, 609 A.2d 440, we held that an occurrence takes place in the geographical area in which the injury or damage occurs for the purpose of applying a war risk and territorial exclusion. Synthesizing the views of other jurisdictions, we observed that "a compensable occurrence comes into existence at the time of the injury," id. at 227, 609 A.2d 440; Appalachian Ins. Co. v. Liberty Mut. Ins. Co., 676 F.2d 56, 62 (3d Cir.1982); Eagle-Picher Indus., Inc. v. Liberty Mut. Ins. Co., 523 F. Supp. 110, 114 (D.Mass. 1981), modified, 682 F.2d 12 (1st Cir.1982), cert. denied, 460 U.S. 1028, 103 S.Ct. 1279-80, 75 L.Ed.2d 500 (1983); Hartford Acc. & Indem. Co. v. Aetna Life & Cas. Ins. Co., 98 N.J. at 27, 483 A.2d 402; Gottlieb v. Newark Ins. Co., 238 N.J. Super. 531, 536, 570 A.2d 443 (App.Div. 1990); Meeker Sharkey Assocs., Inc. v. National Union Fire Ins. Co. of Pittsburgh, Pa., 208 N.J. Super. 354, 357-58, 506 A.2d 19 (App.Div. 1986); Deodato v. Hartford Ins. Co., 143 N.J. Super. 396, 402, 363 A.2d 361 (Law Div. 1976), aff'd, 154 N.J. Super. 263, 381 A.2d 354 (App.Div. 1977); Muller Fuel Oil Co. v. Insurance Co. of N. Am., 95 N.J. Super. at 578-79, 232 A.2d 168, but that, "where there are multiple injuries, the courts ... have determined the number of occurrences by focusing upon the cause or causes which gave rise to the harm," id. 258 N.J. Super. at 228, 609 A.2d 440; Michigan Chem. Corp. v. American Home Assur. Co., 728 F.2d 374, 379 (6th Cir.1984); Maurice Pincoffs Co. v. St. Paul Fire and Marine Ins. Co., 447 F.2d 204, 206-07 (5th Cir.1971); Barrett v. Iowa Nat'l Mut. Ins. Co., 264 F.2d 224, 227 (9th Cir.1959); St. Paul-Mercury Indem. Co. v. Rutland, 225 F.2d 689, 693 (5th Cir.1955); Bartholomew v. Insurance Co. of N. Am., 502 F. Supp. 246, 251 (D.R.I. 1980), aff'd sub nom., Bartholomew v. Appalachian Ins. Co., 655 F.2d 27 (1st Cir.1981); Transport Ins. Co. v. Lee Way Motor Freight, Inc., 487 F. Supp. 1325, 1330 (N.D.Tex. 1980) (Lloyd's policy language); American Cas. Co. of Reading, Pa. v. Heary, 432 F. Supp. 995, 997 (E.D.Va. 1977); Union Carbide Corp. v. Travelers Indem. Co., 399 F. Supp. 12, 21 (W.D.Pa. 1975); Doria v. Insurance Co. of N. Am., 210 N.J. Super. 67, 72-73, 509 A.2d 220 (App.Div. 1986).
*502 In the leading case of Champion Int'l Corp. v. Continental Cas. Co., 546 F.2d 502 (2nd Cir.1976), cert. denied, 434 U.S. 819, 98 S.Ct. 59, 54 L.Ed.2d 75 (1977), the court addressed the precise issue presented here: the meaning of the word "occurrence" in policies written on a "per occurrence" deductible basis. The insured, Champion, sold a large number of vinyl-covered plywood panels to twenty-six manufacturers of houseboats, trailers, motor homes, and campers, which then installed the panels in their products. Id. at 504. The panels proved defective, and the insured paid approximately $1,600,000 to settle the claims of the manufacturers and their customers. Ibid. Champion's insurers denied coverage because the policies had a "per occurrence" deductible of $5,000 and the damage to each vehicle was less than that amount.
On appeal from the district court's judgment in favor of Champion, the Second Circuit affirmed, finding the occurrence to be the insured's sale and distribution of defective panels to the manufacturers rather than each of the 1400 individual installations of panels. Id. at 505-06. Instead of focusing on any particular ambiguity in the contractual language, the court examined the policies in light of the business purposes sought to be achieved by the parties and the plain meaning of the words chosen. Id. at 505.
The court noted that the insuring agreements were not based on each claim but on each occurrence and were "not intended to gauge coverage on the basis of individual accidents giving rise to claims, but rather on the underlying circumstances which resulted in the claim for damages." Id. at 506. Despite hundreds of instances of property damage occurring at different times and places, the court was persuaded by the policies' liability limitation provision directing, as here, that all damage "arising out of continuous or repeated exposure to substantially the same general conditions" be deemed as arising out of one occurrence. Id. at 505; accord, Appalachian Ins. Co. v. Liberty Mut. Ins. Co., 676 F.2d at 61 ("the definition of the term `occurrence'... contemplates that one occurrence may have multiple and disparate impacts on individuals...."); Uniroyal, Inc. v. Home Ins. Co., 707 *503 F. Supp. 1368, 1383 (E.D.N.Y. 1988) (continuous course of delivery of Agent Orange constituted a single occurrence); Transport Ins. Co. v. Lee Way Motor Freight, Inc., 487 F. Supp. at 1329-30 (applying one deductible to damages paid to 47 persons employed at four of the insured's trucking facilities at different periods of time as a result of discriminatory practices).
Significantly, the same result was reached by the district court in construing Aetna's prior policy in this case. In Owens-Illinois, Inc. v. Aetna Cas. and Sur. Co., 597 F. Supp. 1515 (D.D.C. 1984), the court considered whether O-I's liability on claims based upon exposure to Kaylo were "from a single occurrence, that being O-I's manufacture and sale of the product containing asbestos, or multiple occurrences, being each individual claimant's exposure to asbestos." Id. at 1524-25. The court held that "[t]he unifying definitional provisions [which we too have quoted] ma[de] it clear ... the number of injuries or claims, even if temporally removed from their causes, are irrelevant when determining the number of occurrences." Id. at 1525.
In sum, the allocation of rights and obligations established by the insurance policies would be undermined if O-I's coverage was subject to multiple deductibles. We hold that in order to preserve O-I's reasonable expectations, the manufacture and sale of Kaylo must be regarded as the single occurrence triggering liability for asbestos-related injury or damage. O-I's coverage is thus subject to a single deductible for each policy period.

G. MISCELLANEOUS COVERAGE ISSUES
We briefly address the remaining coverage issues. The insurers contend that the Chancery Division's order "can be interpreted to require [them] to indemnify O-I for punitive damage awards assessed against it." They assert that their policies do not cover punitive damages.
We find no need to decide this question. In the six year history of this litigation, the countless pleadings, the protracted discovery, and the myriad of pretrial motions, the insurability of punitive damages was never challenged, discussed, nor briefed by *504 the parties. In New Jersey, "public policy does not permit a tortfeasor to shift the burden of punitive damages to his insurer." Variety Farms, Inc. v. New Jersey Mfrs. Ins. Co., 172 N.J. Super. 10, 25, 410 A.2d 696 (App.Div. 1980); see also Loigman v. Massachusetts Bay Ins., 235 N.J. Super. 67, 73, 561 A.2d 642 (App.Div. 1989); Newark v. Hartford Acc. & Indem. Co., 134 N.J. Super. 537, 547, 342 A.2d 513 (App.Div. 1975). The law of other jurisdictions may be different. See, e.g., Capital Motor Lines v. Loring, 238 Ala. 260, 189 So. 897 (1939); Southern Farm Bureau Cas. Ins. Co. v. Daniel, 246 Ark. 849, 440 S.W.2d 582 (1969); Thrift-Mart, Inc. v. Commercial Union Assur. Cos., 154 Ga. App. 344, 268 S.E.2d 397 (1980); First Nat'l Bank of St. Mary's v. Fidelity and Deposit Co., 283 Md. 228, 389 A.2d 359 (1978); Brown v. Maxey, 124 Wis.2d 426, 369 N.W.2d 677, reconsideration denied, 126 Wis.2d 40, 373 N.W.2d 672 (1985). The problem is compounded by difficult choice of law questions. See State Farm Mut. Auto. Ins. Co. v. Simmons' Estate, 84 N.J. 28, 417 A.2d 488 (1980). Under the circumstances, we will not decide the issue. We traditionally decline to consider questions or issues not properly presented to the trial court when the opportunity for such a presentation was available. Matter of Kovalsky, 195 N.J. Super. 91, 99, 477 A.2d 1295 (App.Div. 1984).
General asserts that the Chancery Division's order unduly restricts its "claims-processing rights" under its reinsurance policies. Although the Chancery Division struck certain language contained in the proposed form of order relating to General's right to review OIL's claims before payment, we discern nothing to indicate that the court intended to abrogate the insurer's contractual rights. Although OIL's brief is silent on the issue, O-I agrees that General has a right to appropriate documentation to determine coverage as a prerequisite to the payment of claims. We find no basis to intervene or to modify the court's order.

III. CONTINUOUS TRIGGER AND ALLOCATION
We now address questions concerning which events, from the point of exposure to the point of manifestation, trigger the *505 policies in question and how best to allocate liability among the insurers. These issues were considered, albeit in a somewhat different setting, in Gottlieb v. Newark Ins. Co., 238 N.J. Super. 531, 570 A.2d 443 (App.Div. 1990), where we noted the problems were "fact sensitive and not properly the subject of an absolute rule." Id. at 537, 570 A.2d 443. We hold that in the context of resolving coverage questions pertaining to asbestos-related risks, each insurer between the initial exposure and the manifestation of disease is liable to the insured for indemnification and defense costs. We also conclude that the insured may collect from any insurer whose coverage has triggered the full amount of the indemnity that is due, subject only to the provisions in the policies that govern the allocation of liability when more than one policy covers an injury or property damage.
We begin our analysis with the policy language. In the United policy, the insurer agreed to pay "all sums which [O-I] shall become legally obligated to pay ... as damages because of personal injury or property damage ... caused by an occurrence." The OIL policy similarly contains an agreement to indemnify O-I for the ultimate net loss it "becomes legally obligated to pay as damages because of personal injury [or] property damage." The language is unambiguous. The United and OIL policies are triggered when personal injury or property damage occurs during the policy period. Once the policy is triggered, the insurer is liable for "all sums" which the insured becomes legally obligated to pay.
Despite the disarming ease with which the insurers' obligation may be articulated, application of the policy language is not always without difficulty. In most cases instituted under this type of policy, the injury and the occurrence transpire simultaneously, or, at least in close proximity to one another. The injury or damage is a discrete, observable event. In cases involving asbestos-related diseases, however, inhalation or exposure  the event that causes the injury or damage  takes place substantially before the manifestation of the ultimate harm. Moreover, exposure may occur over a lengthy period of time and vary in its intensity. As a *506 result, exposure may occur in numerous policy periods. So too, the disease or harm may progress during subsequent policy periods with no observable or measurable impact. Furthermore, the nature, intensity and effect of the exposure are variables that are generally unknown until the actual harm or injury is produced. The development and progression of asbestos-related diseases are not ordinarily realized until the insult to the body produces pain or observable symptoms. To that extent, these diseases  asbestosis, mesothelioma, or lung cancer  are not separate or discrete events, but instead are indivisible.
The terms of the policies do not lead us to a clear and definite resolution of the "trigger" issues raised. Nor was the policy language particularly helpful to the insurers or the insured in determining which policies, if any, were applicable. In our description of the facts, we took pains to note the varying positions of the insurers that emerged with the passage of time and with the gradual knowledge of the proportions of the asbestos problem. It will be recalled that Aetna, the prior insurer, adopted the position the insurable event was not the claimant's exposure to asbestos. Instead, Aetna asserted that manifestation of the injury constituted the event which triggered the protection of the policy then in place. In contrast, United, OIL and the reinsurers urged that exposure or inhalation of asbestos constituted the insurable event. They asserted that tissue damage commenced with exposure to asbestos, an event which conveniently took place before their policies went into effect. At least to some extent, both the "exposure" and "manifestation" theories make some sense. No one currently disputes the fact that asbestos-related diseases develop over a period of time, beginning with the first insult to the body and continuing through repeated exposure. On the other hand, a cogent argument can be made that personal injury does not occur until cellular damage advances to the point of becoming a recognizable disease.
The point to be stressed is that this uncertainty, and the ultimate need to litigate, are exactly what the insured sought to *507 guard against when it purchased insurance. An insurance contract represents "an exchange of an uncertain loss for a certain loss." Keene Corp. v. Insurance Co. of N. Am., 667 F.2d 1034, 1041 (D.C. Cir.), cert. denied, 455 U.S. 1007, 102 S.Ct. 1644, 71 L.Ed.2d 875, reh'g denied, 456 U.S. 951, 102 S.Ct. 2023, 72 L.Ed.2d 476 (1982). The uncertain loss is the risk of incurring legal liability and the certain loss is the premium payment. The insurer agrees to assume the risk of the insured's liability in exchange for a fixed sum of money. Ibid. At the heart of the transaction is the insured's purchase of certainty  a valuable commodity. Ibid.; see also S.S. Huebner, K. Black, Jr., R.S. Cline, Property and Liability Insurance, at 5-7 (2nd ed. 1976).
The "triple trigger" or "continuous trigger" theory represents one judicial response to the problem. It is an attempt to supply certainty where the policy language does not lead unambiguously to either the "exposure" or "manifestation" interpretation. The theory was first expounded in Keene Corp. v. Insurance Co. of N. Am., 667 F.2d at 1047. Confronted with coverage questions concerning asbestos-related risks, the court noted that the "terms `bodily injury,' `sickness' and `disease,' standing alone, simply lack[ed] the precision necessary to identify a point in the development of the disease at which coverage is triggered." Id. at 1043. The court further found that both the "exposure" and "manifestation" theories were at least to some extent rooted in reality. In that respect, the court observed:
The fact that a doctor would characterize cellular damage as a discrete injury does not necessarily imply that the damage is an "injury" for the purpose of construing the policies. At the same time, the fact that an ordinary person would characterize a fully developed disease as an "injury" does not necessarily imply that the manifestation of the disease is the point of "injury" for purposes of construing the policies. In interpreting a contract, a term's ordinary definition should be given weight, but the definition is only useful when viewed in the context of the contract as a whole.
[Ibid.]
The court resolved the problem by holding that where an injury process is not a definite, discrete event, the date of the occurrence is continuous, encompassing the period from exposure to manifestation *508 of injury or damage. Id. at 1047. In the context of asbestos-related risks, the court concluded that "inhalation exposure, exposure in residence, and manifestation [of injury or damage] all trigger coverage under the policies." Ibid.
We are convinced that the "continuous trigger" theory best accommodates the competing interests of insurers and the insured. Although several courts and legal commentators have attacked the theory as an effort to maximize insurance coverage by finding an ambiguity where none is present, see, e.g., American Home Prods. Corp. v. Liberty Mut. Ins. Co., 748 F.2d 760, 765-66 (2nd Cir.1984); Arness and Eliason, Insurance Coverage for "Property Damage" in Asbestos and Other Toxic Tort Cases, 72 U.Va.L.Rev. 943, 973 (1986); Note, Developments in the Law  Toxic Waste Litigation, 99 Harv.L.Rev. 1458, 1581-82 (1986), we disagree with that characterization. We further note that the injury-in-fact approach rests on an idealized notion of scientific causation, in which discrete events cause discrete injuries. The onset of a disease or injury is often difficult to pinpoint. The feasibility of identifying, even approximately, the time of injury-in-fact in many modern toxic tort cases must be in "serious doubt." Uniroyal Inc. v. Home Ins. Co., 707 F. Supp. at 1388. "The etiology of numerous diseases resulting from toxic substances is only roughly understood." Ibid. As this case clearly discloses, many injuries are not distinct events, "but are continuous or gradual insult-inducing processes." Ibid. While the courts have sought to meet the challenge by devising ingenious formulas, ibid., the injury-in-fact trigger often results in a solution derived at "[b]y stringing approximation after approximation." New Castle County v. Continental Cas. Co. (CNA), 725 F. Supp. 800, 811 (D.Del. 1989), modified, 933 F.2d 1162 (3d Cir.1991), appeal after remand, 970 F.2d 1267 (3d Cir.1992). We believe that the continuous trigger theory best comports with what medical science teaches and what common sense dictates, that a disease begins with the onset of exposure and continues until the illness becomes manifest. It follows that insurance policies in place from exposure to manifestation are implicated and afford coverage.
*509 We previously quoted the policies in question which require the insurer to indemnify the insured for "all sums" it becomes legally obligated to pay. We have defined "personal injury" to mean any part of the injurious process that begins with initial exposure and concludes with manifestation of disease. Defendants contend that each insurer is required to pay only a prorated share of O-I's liability. They argue that once an insurer's coverage is triggered, its share would be determined by the duration of a claimant's exposure during its policy period in comparison to the entire duration of exposure to the insured's products.
We disagree with this contention. However phrased, the insurers' argument is based on their characterization of asbestos-related diseases as consisting of a multitude of discrete injuries to the lung tissue. That description of the disease process defies reality. We declined to rely upon it in determining the triggering event of insurance coverage. It has no greater efficacy in determining the extent of coverage. In our view, questions of the trigger of coverage and the extent of coverage are inextricably intertwined. We hold that once an insurer's coverage is triggered, it is liable for the full extent of the insured's liability up to the policy limits, but subject to the "other insurance" clauses contained in the insuring agreements.
Each policy has a built-in trigger of coverage. There is nothing in the policies that provides for a reduction of the insurer's liability if an injury occurs only in part of a policy period. The policies cover O-I's entire liability once they are triggered. For an insurer to be only partially liable for an injury that occurred in part during its policy period would deprive the insured of its objectively reasonable expectations pertaining to the coverage for which it paid. We recognize that our interpretation of the insurer's obligation has not received universal approval, see Insurance Co. of N. Am. v. Forty-Eight Insulations, Inc., 633 F.2d at 1225; Sandoz, Inc. v. Employer's Liab. Assur. Corp., 554 F. Supp. 257, 266 (D.N.J. 1983), but the great weight of authority supports the view we have adopted, see, e.g., ACandS, Inc. v. Aetna Cas. and Sur. Co., 764 F.2d 968, 974 (3d Cir.1985); Keene Corp. v. Insurance *510 Co. of N. Am., 667 F.2d at 1047; New Castle County v. Continental Cas. Co. (CNA), 725 F. Supp. at 812-13; Air Prods. & Chems., Inc. v. Hartford Acc. & Indem. Co., 707 F. Supp. 762, 771-73 (E.D.Pa. 1989); Dayton Indep. Sch. Dist. v. National Gypsum Co., 682 F. Supp. 1403, 1410 (E.D.Tex. 1988), rev'd sub nom., W.R. Grace & Co. v. Continental Cas. Co., 896 F.2d 865 (5th Cir.1990); Lac D'Amiante Du Quebec Ltee. v. American Home Assur. Co., 613 F. Supp. 1549, 1561 (D.N.J. 1985). Because the evidence cannot specifically identify and quantify the injury actually sustained during the policy period, we agree with the Chancery Division that liability should be joint and several.
What has been said thus far applies with equal force to claims for both personal injury and property damage. In Gottlieb v. Newark Ins. Co., we applied the continuous trigger theory to coverage questions relating to property damage claims. 238 N.J. Super. at 537, 570 A.2d 443. Other courts have likewise applied the theory to property damage cases. See, e.g., New Castle County v. Continental Cas. Co. (CNA), 725 F. Supp. at 809; see also Riehl v. Travelers Ins. Co., 772 F.2d 19, 23 (3d Cir.1985) (discussing the problem but not deciding the legal issue). In New Castle County v. Continental Cas. Co. (CNA), for example, the district court, "[r]ecognizing the `somewhat parallel' nature of a disease that inflicts progressive bodily injury and the slow leaching of pollutants from a landfill to adjacent properties," applied the doctrine. Id. at 809. We agree with that court's conclusion that an ongoing process of property damage triggers every policy during the destructive process. Id. at 812. In a similar vein, we are in accord with that court's determination that proration is contrary to the express wording of the policies in question and is inconsistent with what we know about the gradual effect of exposure to asbestos. Id. at 817. As we noted previously, the insurers may be entitled to contribution from other carriers whose policies have been triggered. Ibid.; see also Dayton Indep. Sch. Dist. v. National Gypsum Co., 682 F. Supp. at 1411 n. 21. However, the primary duty of the insurer is to ensure full indemnification of the insured, here O-I.
*511 The policies provide generally that the insurers shall defend any suit against O-I even if groundless, false or fraudulent. Because we hold that each insurer is fully liable to O-I for indemnification, it follows that each is fully liable for defense costs. See Keene Corp. v. Insurance Co. of N. Am., 667 F.2d at 1050-51. We need not determine whether or how these defense costs may be allocated between the insurers. See Voorhees v. Preferred Mut. Ins. Co., 246 N.J. Super. 564, 588 A.2d 417 (App.Div. 1991), aff'd, 128 N.J. 165, 607 A.2d 1255 (1992); compare Burlington Drug Co., Inc. v. Royal Globe Ins. Co., 616 F. Supp. 481, 483 (D.Vt. 1985); Crist v. Insurance Co. of N. Am., 529 F. Supp. 601, 604-05 (D.Utah 1982); Tampa Electric Co. v. Stone & Webster Eng'g Corp., 367 F. Supp. 27, 30-31 (M.D.Fla. 1973); Hogan v. Midland Nat'l Ins. Co., 3 Cal.3d 553, 563-65, 91 Cal. Rptr. 153, 159-60, 476 P.2d 825, 831-32 (1970); Jostens, Inc. v. CNA Ins./Continental Cas. Co., 403 N.W.2d 625, 631 (Minn. 1987); Home Ins. Co. v. Pinski Bros., Inc., 160 Mont. 219, 227-28, 500 P.2d 945, 950 (1972); National Steel Constr. Co. v. National Union Fire Ins. Co. of Pittsburgh, 14 Wash. App. 573, 575-76, 543 P.2d 642, 644 (1975), with Equal Employment Opportunity Comm'n v. Southern Publishing Co., Inc., 894 F.2d 785, 791-92 (5th Cir.1990); Budd Co. v. Travelers Indem. Co., 820 F.2d 787, 790 (6th Cir.1987); Insurance Co. of N. Am. v. Forty-Eight Insulations, Inc., 633 F.2d at 1224-25; Waite v. Aetna Cas. and Sur. Co., 77 Wash.2d 850, 856-59, 467 P.2d 847, 852-53 (1970) (en banc).

IV. FACTUAL ISSUES REQUIRING A TRIAL
At the outset of our opinion, we outlined three genuine issues of material fact that require a trial: (1) whether O-I's losses were expected or intended, (2) whether the insurers and reinsurers waived their fraud defenses, and (3) whether the policies were issued under a reasonable misrepresentation or concealment of material facts pertaining to potential asbestos liability. We preface our discussion of these questions with the following comments.
*512 We recognize that the record before the Chancery Division was voluminous. The attorneys' presentation of evidence relating to the factual issues was exhaustive. In light of the protracted discovery proceedings and the extensive deposition transcripts and documents, O-I has predicted that a trial will inevitably yield the same conclusions as were reached by the Chancery Division on summary judgment. That prediction may ultimately prove to be accurate. Nevertheless, we repeat what has become a legal aphorism, that summary judgment is a "stringent remedy" and that the moving party's burden is "to exclude any reasonable doubt as to the existence of any genuine issue of material fact." Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 74-75, 110 A.2d 24 (1954).
The point is perhaps more complicated here because we are faced with a dispute involving competing and mutually exclusive policy considerations. We alluded previously to the reasons for purchasing an insurance policy. To reiterate, what is involved is an exchange of an uncertain loss for a certain loss. The insurer agrees to assume the risk of the insured's liability in exchange for a fixed sum of money. Clearly, the insured's reasonable expectations of peace and security are defeated where the insurer is permitted to conjure up factual issues that are divorced from reality or are at best ephemeral. To that extent, summary judgment presents an appropriate vehicle for assuring the certainty of indemnification paid for by the insured. On the other hand, the courts have been repeatedly admonished not to grant summary judgment where the essential issue to be resolved pertains to a party's state of mind or intent. See, e.g., Ruvolo v. American Cas. Co., 39 N.J. 490, 500-01, 189 A.2d 204 (1963); Bello v. Hurley Limousines, Inc., 249 N.J. Super. 31, 41, 591 A.2d 1356 (App.Div. 1991). Against this backdrop, we observe that the common thread of all the factual issues in this case is what the parties knew and when they knew it. We do not suggest that this type of litigation is immune from summary judgment. However, the right to such disposition ought to appear so clearly as to leave no room for controversy. Ruvolo v. American Cas. Co., 39 N.J. at 501, 189 *513 A.2d 204; see also Shanley & Fisher, P.C. v. Sisselman, 215 N.J. Super. 200, 211-12, 521 A.2d 872 (App.Div. 1987).
On the record before us, we are convinced that a trial will present a more solid basis for findings regarding the factual issues presented. In part, the parties' rights to succeed on the motions depend on issues of credibility. In such a factual framework, we believe that a plenary trial is necessary.

A. EXPECTED OR INTENDED LOSSES
All of the insuring agreements barred coverage for "expected" or "intended" losses. In Diamond Shamrock Chemicals v. Aetna, 258 N.J. Super. at 212, 609 A.2d 440, we observed that this "`occurrence-based' language ha[d] spawned a substantial amount of litigation." See Ambassador Ins. Co. v. Montes, 76 N.J. 477, 388 A.2d 603 (1978); see also Prudential Property and Cas. Ins. Co. v. Karlinski, 251 N.J. Super. 457, 463, 598 A.2d 918 (App.Div. 1991); Atlantic Employers Ins. Co. v. Tots & Toddlers Pre-school Day Care Ctr., Inc., 239 N.J. Super. 276, 281-82, 571 A.2d 300 (App.Div.), certif. denied, 122 N.J. 147, 584 A.2d 218 (1990); Lyons v. Hartford Ins. Group, 125 N.J. Super. 239, 245, 310 A.2d 485 (App.Div. 1973), certif. denied, 64 N.J. 322, 315 A.2d 411 (1974); cf. Allstate Ins. Co. v. Schmitt, 238 N.J. Super. 619, 623, 570 A.2d 488 (App.Div.), certif. denied, 122 N.J. 395, 585 A.2d 394 (1990). Whatever confusion existed previously on the subject was eradicated by our Supreme Court in Voorhees v. Preferred Mut. Ins. Co., 128 N.J. 165, 607 A.2d 1255 (1992), and SL Industries, Inc. v. American Motorists Ins. Co., 128 N.J. 188, 607 A.2d 1266 (1992), opinions which were rendered following entry of the Chancery Division's judgment in this case.
In Voorhees, the Court held that the accidental nature of an occurrence is not to be determined on the basis of whether or not the insured's conduct was intentional, but on whether it "intended or expected to cause an injury." 128 N.J. at 183, 607 A.2d 1255. If the ends were not anticipated, "then the resulting injury is `accidental,' even if the act that caused the injury was intentional." *514 Ibid. The Court reasoned that this approach "prevents those who intentionally cause harm from unjustly benefiting from insurance coverage while providing injured victims with the greatest chance of compensation consistent with the need to deter wrong-doing." Ibid. Two different factual scenarios were posited. First, where the actions in question seem "foolhardy and reckless," the courts must inquire into the actor's subjective intent to cause injury. Id. at 184, 607 A.2d 1255. Second, "[w]hen the actions are particularly reprehensible, the intent to injure can be presumed from the act without an inquiry into the actor's subjective intent to injure." Ibid. Thus, "[a]bsent exceptional circumstances that objectively establish the insured's intent to injure, we will look to the insured's subjective intent to determine intent to injure." Id. at 185, 607 A.2d 1255.
In SL Industries, the Court considered related questions concerning the nature and extent of the insured's intent, specifically, "whether any intent to injure will render the resulting injury intentional, whether the wrongdoer must intend the specific injury that results, or whether there is some middle ground between the two approaches." 128 N.J. at 209, 607 A.2d 1266. The Court answered these questions in the following manner:
Assuming the wrongdoer subjectively intends or expects to cause some sort of injury, that intent will generally preclude coverage. If there is evidence that the extent of the injuries was improbable, however, then the court must inquire as to whether the insured subjectively intended or expected to cause that injury. Lacking that intent, the injury was "accidental" and coverage will be provided.

[Id. at 212, 607 A.2d 1266].
This approach was said to conform to an insured's objectively reasonable expectation while deterring intentional wrongdoing. Ibid.
As we noted earlier, the Chancery Division did not have the benefit of these opinions. In any event, we are persuaded that the Saranac Laboratory studies and other materials described in our statement of facts raise genuine issues regarding whether O-I knew of the perils of asbestos during the period in which it manufactured and sold Kaylo. We acknowledge that any large-scale *515 manufacturer probably can predict that its products will cause some harm to the consumer at sometime and under some circumstances. O-I's counsel noted, for example, that tire manufacturers foresee that "blow-outs" will inevitably occur and people and property will be harmed. This is all part of a risk-utility analysis. Counsel observed that denial of insurance coverage on that basis would stop our economy in its tracks. If that was the gist of the insurers' allegations, we would undoubtedly agree. However, "it isn't, and we don't." Instead, the insurers claim that O-I deliberately marketed Kaylo long after it learned of the product's propensity to cause injury. We believe that this issue requires further airing. Concededly, the facts produced to date are not nearly as egregious as those in Diamond Shamrock Chemicals v. Aetna, where we sustained the Chancery Division's finding that the plaintiff's release of pollutants was intentional and the resulting damage expected. 258 N.J. Super. at 215, 609 A.2d 440. But that finding was made after a full trial. We are of the view that the insurers deserve their day in court respecting this question.

B. WAIVER OF FRAUD DEFENSES
The Chancery Division determined that the insurers and reinsurers waived their fraud defenses by failing to take prompt action to rescind or reform the insurance policies upon learning of the concealment of O-I's asbestos risks. In support of this conclusion, the court cited evidence indicating that by the autumn of 1980, the defendants were aware of O-I's prior production of Kaylo and the asbestos cases then pending against the insured. The court noted that United, OIL and General had undertaken an extensive audit of O-I as a result of their suspicions, and that CIGNA and Allstate could have taken similar action had they wished to pursue that course. The court also cited the insurers' various post-August 1980 letters in which they challenged O-I's assertion of coverage on the "trigger" and "per-occurrence" grounds that we rejected earlier in our opinion. The court observed that the insurers had waived their fraud defenses by *516 limiting their objections to those arguments. Finally, the court found that O-I was prejudiced by the insurers' failure to assert fraud promptly because documents had been lost and their copies were difficult to decipher, and witnesses' recollections had dimmed in the interim. While much of the evidence relied upon by the court is persuasive, we hold that genuine issues of material fact exist and that waiver was not established as a matter of law.
In reaching a contrary conclusion, the Chancery Division heavily relied upon Merchants Indem. Corp. v. Eggleston, 37 N.J. 114, 179 A.2d 505 (1962). The facts in Eggleston were simple. Merchants issued a "family automobile policy" which, among other things, included an automobile registered to the named insured's wife. Id. at 119, 179 A.2d 505. While driven by the wife's brother, the automobile was involved in a serious accident from which a law suit emerged. Id. at 125, 179 A.2d 505. Two weeks after the accident, Merchants learned that the automobile really belonged to the wife's brother. Ibid. Nevertheless, Merchants assigned an attorney who filed an answer and a third-party complaint and participated in discovery proceedings. Ibid. Some nine months after the accident, Merchants filed a declaratory judgment action in which it disclaimed liability. Ibid. Merchants nonetheless continued to defend the legal action, which had already been retried and was awaiting trial by the time of the hearing. Id. at 126, 179 A.2d 505.
Our Supreme Court held that Merchants' defense of the action without a reservation of rights was incompatible with its denial of liability. Ibid. In this respect, the Court observed that "it would be unfair to permit a carrier to control the defense without the consent of the insured and then leave the judgment for his payment." Id. at 127, 179 A.2d 505. The Court also found that Merchants had waived its defense of fraud by failing to assert it in a timely manner. Id. at 131-32, 179 A.2d 505. The Court reasoned that:
When a contract is obtained by fraud, the law grants the injured party a choice. He may rescind or affirm. If he rescinds, he must return what he received, here the premium for covering the Thunderbird, albeit the amount is quite small. On *517 the other hand, he may choose to affirm the contract, whereupon he retains the consideration he received and has as well a claim for money damages for deceit, which in the circumstances of a liability policy would probably be at best a claim for such additional premium as should have been paid for the coverage. But the defrauded party must thus elect which course he wishes to follow. He cannot pursue both. If he elects to continue with the contract, the election is final and the contract is affirmed, not because he wants it to be, but because the law makes it so. And if by his conduct he affirms the contract, he cannot be heard to say that he did not "voluntarily" or "intentionally" relinquish his right to call off the deal.
* * * * * * * *
If a carrier receives information suggesting fraud or breach of contract, it must seek the facts with reasonable diligence, and having acquired them it must within a reasonable period decide whether to continue to perform. What is a reasonable time depends upon the circumstances.
[Id. at 130-31, 179 A.2d 505].
It is no exaggeration to suggest that the facts here are much more complicated. Initially, Johnson's status is somewhat unclear. The general rule is that "when knowledge is acquired by the officers or agent of one corporation while acting on behalf of another corporation, this knowledge will not be imputed to the former corporation." Paterson v. Fargo Realty, Inc., 174 N.J. Super. 178, 192, 415 A.2d 1210 (Cty.Ct. 1980); see also Montclair Bldg. & Loan Ass'n v. Miller, 93 N.J. Eq., 653, 655, 117 A. 140 (E. & A. 1922). There is an exception to this general rule where both business entities are close corporations. See State v. Graziani, 60 N.J. Super. 1, 17, 158 A.2d 375 (App.Div. 1959), aff'd, 31 N.J. 538, 158 A.2d 330, cert. denied, 363 U.S. 830, 80 S.Ct. 1601, 4 L.Ed.2d 1524 (1960). Although we might be inclined to pierce the multiplicity of relationships in the context of a captive insurer, Johnson's knowledge of the enormity of the asbestos problem remains an issue that has not been fully resolved. It is true that Johnson's July 30, 1980 letter and OIL's subsequent September 16, 1980 correspondence indicate that by the fall of 1980, OIL was on notice that O-I (1) had produced Kaylo, and (2) had asbestos cases pending against it. This much conceded, Johnson testified that in the summer of 1979 he believed O-I's asbestos exposure was "peaking" based on his assertion that most claims were filed within twenty years of exposure. Further, many claims had been *518 submitted to Aetna based on the exposure theory. More importantly, Johnson's familiarity with the Saranac Laboratory reports and the warnings repeatedly issued by Vorwald and Gardner were not fully explored.
The claim of waiver against the reinsurers is weaker still, because Johnson's knowledge of the asbestos problem cannot be imputed to them. There are other problems, however, that should be explored. Several of the insurers claim that they did not have grounds for suspecting OIL's "bad faith" until they learned of Johnson's dual capacity as O-I's risk manager and OIL's officer and director. Further, the record does not indicate when the insurers learned of the Saranac Laboratory reports and O-I's alleged knowledge of the perils of asbestos.
We are also troubled by other issues. O-I alleges various conversations with representatives of several ARMS entities in which the asbestos risk was allegedly discussed. At least one of these conversations allegedly took place as early as May 15, 1978. As a general rule, a broker acts as the agent of the insured, not as the agent of the insurer. See Wang v. Allstate Ins. Co., 125 N.J. 2, 13, 592 A.2d 527 (1991); Avery v. Arthur E. Armitage Agency, 242 N.J. Super. 293, 299, 576 A.2d 907 (App.Div. 1990); Johnson v. Mac Millan, 233 N.J. Super. 56, 60, 558 A.2d 24 (App.Div.), remanded on other grounds, 118 N.J. 199, 570 A.2d 962 (1989). However, we question whether that principle is applicable here. The tangled web of incestuous relationships between the Fred Reiss Group, the ARMS defendants and affiliates, and the insurers and reinsurers give us pause. We need not resolve the issue here. We merely note that the question should be further developed at trial to determine whether a special relationship existed between the various parties which would require application of different rules. Cf. Sobotor v. Prudential Property & Cas. Ins. Co., 200 N.J. Super. 333, 491 A.2d 737 (App.Div. 1984).
Waiver is the intentional relinquishment of a known right. West Jersey Title and Guar. Co. v. Industrial Trust Co., 27 N.J. 144, 152, 141 A.2d 782 (1958). Thus, it must be shown that the *519 party charged with the waiver knew of his or her legal rights and deliberately intended to relinquish them. Shebar v. Sanyo Business Sys. Corp., 111 N.J. 276, 291, 544 A.2d 377 (1988); Petrillo v. Bachenberg, 263 N.J. Super. 472, 480, 623 A.2d 272 (App.Div. 1993) (slip op. at 8); Country Chevrolet, Inc. v. North Brunswick Planning Bd., 190 N.J. Super. 376, 380, 463 A.2d 960 (App.Div. 1983); State v. Morgenstein, 147 N.J. Super. 234, 238, 371 A.2d 96 (App.Div. 1977); Allstate Ins. Co. v. Howard Sav. Inst., 127 N.J. Super. 479, 488, 317 A.2d 770 (Ch.Div. 1974). Our Supreme Court has emphasized that issues of waiver "are usually questions of intent, which are factual determinations that should not be made on a motion for summary judgment." Shebar v. Sanyo Business Sys. Corp., 111 N.J. at 291, 544 A.2d 377. Other jurisdictions have agreed in factual settings similar to that presented here. See, e.g., Apponi v. Sunshine Biscuits, Inc., 809 F.2d 1210, 1217 (6th Cir.), cert. denied, 484 U.S. 820, 108 S.Ct. 77, 98 L.Ed.2d 40 (1987); Mardirosian v. Lincoln Nat'l Life Ins. Co., 739 F.2d 474, 477 (9th Cir.1984); Havoco of Am., Ltd. v. Hilco, Inc., 731 F.2d 1282, 1293 (7th Cir.1984), rev'd, 799 F.2d 349 (7th Cir.1986), aff'd after remand, 971 F.2d 1332 (7th Cir.1992); see also Security Mut. Cas. Co. v. Affiliated FM Ins. Co., 471 F.2d 238, 246-47 (8th Cir.1972); Keehn v. Excess Ins. Co. of Am., 129 F.2d 503, 506 (7th Cir.1942); Calvert Fire Ins. Co. v. Unigard Mut. Ins. Co., 526 F. Supp. 623, 650-51 (D.Neb. 1980), aff'd, 676 F.2d 707 (8th Cir.1982). We are convinced that the question should not have been resolved in summary fashion notwithstanding the voluminous record before the Chancery Division.
We also disagree with the Chancery Division's decision that the insurers waived their fraud defenses because their post-1980 letters did not specifically include that ground as a basis for challenging their responsibility for the asbestos claims. The principle relied upon by the Chancery Division is derived from Mariani v. Bender, 85 N.J. Super. 490, 205 A.2d 323 (App.Div. 1964). There, we said that, because the insurer did not disclaim liability due to breach of the notice clause by the insured, it could not later raise that defense in a suit for indemnification. Id. at *520 499, 205 A.2d 323. Perhaps that principle was too broadly stated. Other jurisdictions have held that a disclaimer letter does not invariably bind an insurer to the arguments set forth, and the issue is factual and depends upon the relationship between the parties. See, e.g., Meth v. United Benefit Life Ins. Co., 198 F.2d 446, 447 (3d Cir.1952); Intel Corp. v. Hartford Acc. and Indem. Co., 692 F. Supp. 1171, 1178-80 (N.D.Cal. 1988), aff'd in part, rev'd in part, 952 F.2d 1551 (9th Cir.1991); Weintraub v. St. Paul Fire & Marine Ins. Co., 609 F. Supp. 273, 275 (E.D.Pa. 1985); Guberman v. William Penn Life Ins. Co. of N.Y., 146 A.D.2d 8, 11-12, 538 N.Y.S.2d 571, 573 (1989); Llewellyn v. State Farm Mut. Auto. Ins. Co., 222 Tenn. 542, 545, 438 S.W.2d 741, 742-43 (1969). In any event, the principle may not apply here where the insurers contend that their knowledge of the relevant facts continued to emerge up to and even after filing of the complaint.
Finally, we find little support in the record for the Chancery Division's finding of prejudice. First, the record is barren of evidence indicating that "critical" documents were lost. The one and only document cited by the court, the alleged "marked up Aetna policy," was found in O-I's files. If any other relevant documents were in fact misplaced  and none have been identified  there is utterly no evidence that they were lost between 1980 and 1984. Second, no showing was made that important evidence was irretrievably lost because of the faulty recollections of witnesses. Third, the record does not disclose whether O-I could have obtained insurance covering the asbestos risks between 1980 and 1984. O-I's own counsel stated in his deposition testimony that the opposite was true, that after 1977 "it was no longer economically feasible for [O-I] to purchase this insurance...." ARMS' Lonsdale echoed this view. He testified that no insurer would have assumed the risk of asbestos claim exposure had the true facts been known. Of course, the Chancery Division was not bound by these statements. However, the evidence did not disclose, as a matter of law, that O-I was prejudiced by the insurers' tardy assertion of fraud.

*521 C. FRAUD DEFENSES
Because of the Chancery Division's determination regarding the waiver issue, it did not reach the question of fraud. We hold that genuine issues of material fact are presented concerning whether O-I and OIL concealed from the insurers and reinsurers the asbestos-related liabilities to which they were subject.
It has been said that "[e]very fraud in its most general and fundamental conception consists of the obtaining of an undue advantage by means of some act or omission that is unconscientious or a violation of good faith." Jewish Ctr. of Sussex Cty. v. Whale, 86 N.J. 619, 624, 432 A.2d 521 (1981). Legal fraud consists of a material representation of a past or present fact, made with knowledge of its falsity and with the intention that the other party rely thereon, and resulting in detriment to that party. Ibid.; United Jersey Bank v. Wolosoff, 196 N.J. Super. 553, 564, 483 A.2d 821 (App.Div. 1984); Foont-Freedenfeld Corp. v. Electro Protective Corp., 126 N.J. Super. 254, 257, 314 A.2d 69 (App.Div. 1973), aff'd, 64 N.J. 197, 314 A.2d 68 (1974). The elements of scienter, that is, knowledge of the falsity and an intention to obtain an undue advantage, are not essential if plaintiff seeks to prove that a misrepresentation constituted only equitable fraud. Massachusetts Mut. Life Ins. Co. v. Manzo, 122 N.J. 104, 113, 584 A.2d 190 (1991); Bonnco Petrol, Inc. v. Epstein, 115 N.J. 599, 609, 560 A.2d 655 (1989); Jewish Ctr. of Sussex Cty. v. Whale, 86 N.J. at 625, 432 A.2d 521; but see Longobardi v. Chubb Ins. Co. of New Jersey, 121 N.J. at 540, 582 A.2d 1257 (for insurer to void policy because of post-loss misrepresentation, misrepresentation must be "knowing and material"). Where, as here, a party seeks only equitable remedies, "he or she need meet only the lesser burden; it is not necessary to show scienter." Bonnco Petrol, Inc. v. Epstein, 115 N.J. at 609, 560 A.2d 655; see also Jewish Ctr. of Sussex Cty. v. Whale, 86 N.J. at 625, 432 A.2d 521. "Both [reformation and rescission] are available remedies in an action for equitable fraud." Bonnco Petrol, Inc. v. Epstein, 115 N.J. at 611, 560 A.2d 655; see also Enright v. Lubow, 202 N.J. Super. 58, 72, *522 493 A.2d 1288 (App.Div. 1985), certif. denied, 104 N.J. 376, 517 A.2d 386 (1986); Gherardi v. Trenton Bd. of Educ., 53 N.J. Super. 349, 366, 147 A.2d 535 (App.Div. 1958). The object of equitable remedies such as reformation and rescission "is to restore the parties to the status quo ante and to prevent the party who is responsible for the misrepresentation from gaining a benefit." Bonnco Petrol, Inc. v. Epstein, 115 N.J. at 612, 560 A.2d 655.
Against this backdrop, we find factual issues exist as to whether O-I misrepresented or concealed the asbestos-related risks inherent in its production of Kaylo. So too, we conclude that factual questions are presented whether OIL, the ceding insurer, misrepresented or concealed the true facts with respect to the reinsurers. See Sun Mut. Ins. Co. v. Ocean Ins. Co., 107 U.S. at 510, 1 S.Ct. at 599-600, 27 L.Ed. at 345; Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 13 (2nd Cir.1986), cert. denied, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987); A/S Ivarans Rederei v. Puerto Rico Ports Auth., 617 F.2d at 905. It would be superfluous for us to describe in detail the evidence pertaining to O-I's production of Kaylo, the Saranac Laboratory reports, the warnings issued by Gardner and Vorwald, and O-I's emerging knowledge regarding the legal liabilities it faced. Questions of fraud and concealment are generally factual and not readily susceptible to summary disposition. In light of the overall picture, we are satisfied that the factual issues require a plenary trial.

V. CONCLUSION
We do not decide the remaining issues. Specifically, we do not reach the questions presented by the parties concerning discovery. We have remanded the matter for trial on several issues. Should the parties wish to pursue further discovery, their applications should be addressed by the Chancery Division. So too, we do not decide whether O-I is entitled to counsel fees under R. 4:42-9(a)(6). The question was only obliquely raised below, and we have no occasion to resolve it.
*523 The problems that complex technical cases such as this pose for the reviewing court cannot be overstated. In that context, we would be remiss were we to fail to note the excellent quality of the briefs submitted by all counsel.
The Chancery Division's order is affirmed in part and reversed in part. The matter is remanded for further proceedings consistent with this opinion.